No. 101,145

UNIFIED SCHOOL DISTRICT NO. 446, INDEPENDENCE, KANSAS, *Appellee*, v. DEBORAH L. SANDOVAL, *Appellant*.

(286 P.3d 542)

Opinion filed August 31, 2012.

*David M. Schauner*, of Kansas National Education Association, of Topeka, argued the cause, and *Marjorie A. Blaufuss*, of the same association, was on the brief for appellant.

*Donna L. Whiteman*, of Kansas Association of School Boards, of Topeka, argued the cause, and *Angela E. Stallbaumer* and *Sean K. Scally*, of the same association, were with her on the briefs for appellee.

The opinion of the court was delivered by

ROSEN, J.: On review of an unpublished opinion by the Court of Appeals, this court considers whether the district court properly found an enforceable oral contract to terminate Deborah L. Sandoval's employment as a teacher with Unified School District No. 446, Independence, Kansas (the District).

Sandoval began her employment with the District on September 1, 2000. During the 2007-08 school year, she taught Spanish at Independence High School. On February 22, 2008, Principal Mitch Shaw informed her that he was recommending the District not renew her teaching contract for the 2008-09 school year and that the superintendant and the Board of Education of Unified School District No. 446 (board) supported his decision.

On the morning of March 10, 2008, a local Kansas National Education Association (KNEA) leader, Tim Knoles, informed Sandoval that Superintendent Chuck Schmidt would be available to talk with her before that evening's board meeting. That afternoon, Sandoval met with Schmidt and with her KNEA UniServ Director, Tony White. A UniServ director is employed by KNEA to represent teachers in employment matters. The parties were unable to come to terms at that time.

White attended the board meeting that evening, where he sat in a different room from the board and staff and communicated in person with the board through Schmidt and with Sandoval by telephone. The board met in executive session to discuss Sandoval's contract and possible resignation but took no action in open session.

During the course of the meeting, White called Sandoval and told her the board had made an offer of paid leave until the end of a disability period but had offered no insurance and no additional financial compensation. She rejected that offer and authorized White to make a counteroffer of 180 days of paid leave, medical insurance until she reached the age of 65, and a lump-sum payment of $20,000.

White subsequently called Sandoval again and reported that the board had made a counteroffer of 180 days of paid leave to qualify for KPERS disability benefits, which would require her to leave the classroom on March 28, 2008; paid insurance on the bottom tier for 5 years; and a lump-sum payment of $20,000 in the event that she did not qualify for disability benefits. Sandoval told White to accept the proposal on her behalf.

District policy allows the board to consider the resignation of any certified employee that is submitted to the board in writing. After the meeting, White approached Schmidt and asked him how the board wanted to arrange putting the settlement in writing. White offered to provide a draft based on standard settlement agreements, which typically address personnel files, removal of personal property, and confidentiality. Schmidt responded that an attorney for the board would draft the agreement. On the afternoon of March 12, 2008, White received from Schmidt an e-mail draft of a settlement agreement. White sent a reply, suggesting several modifications of the terms. The two exchanged additional messages relating to the acceptability of the modifications.

Later in the day on March 12, Sandoval informed Knoles that she had changed her mind and wanted to proceed with a due process hearing. She repeated this information to White on the following day. White immediately tried to get in touch with Schmidt and, later that week, he notified Schmidt that Sandoval was no longer willing to accept the board's terms communicated to her on the evening of March 10.

On March 24, 2008, Schmidt sent Sandoval a letter stating that the board had deferred nonrenewal of her contract from the March 10 meeting because it understood that an agreement had been reached. The letter went on to say: "Since we have now been informed that you changed your mind on this settlement, this letter is to inform you that the USD 446 Board of Education will proceed with a resolution to non-renew your contract at the board meeting on April 14, 2008."

On March 28, 2008, Sandoval went to the school and taught her class as she usually did. The District provided no substitute teacher for her classroom on that day or any of the following days. She

finished her teaching assignment for the 2007-08 school year. On April 14, 2008, the board adopted a resolution of nonrenewal of Sandoval's contract, including a clause reserving the right to enforce the oral agreement that had been arrived at during the March 10 board meeting.

After the end of the school term, the District filed a petition in Montgomery County District Court. The petition sought a declaratory judgment that Sandoval had entered into an oral contract governing the terms of her separation from the District. It also sought an injunction barring a statutory due process hearing because she had agreed to terminate her employment. The district court granted the temporary injunction. The parties both filed motions for summary judgment.

On August 29, 2008, the district court entered an order granting summary judgment to the District, holding that Sandoval had entered into a binding oral contract with the District. As a consequence, she had waived her statutory due process hearing. The Court of Appeals affirmed the decision in an unpublished opinion. This court granted Sandoval's petition for review.

Both parties urge this court to decide the issue based on the pleadings and uncontroverted facts. The parties filed cross-motions for summary judgment, and the uncontroverted facts contained in the motions provide a sufficient basis for this court to determine as a matter of law whether the parties were bound by an enforceable oral contract.

When the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law, summary judgment is appropriate. The district court is required to resolve all facts and inferences that may reasonably be drawn from the evidence in favor of the party against whom the ruling is sought. When opposing a motion for summary judgment, an adverse party must come forward with evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issues in the case. On appeal, the same rules apply; summary judgment must be denied

if reasonable minds could differ as to the conclusions drawn from the evidence. Questions of law, including those at the heart of summary judgment decisions, are subject to de novo review on appeal. *Thomas v. Board of Shawnee County Comm'rs*, 293 Kan. 208, Syl. ¶¶ 1, 2, 262 P.3d 336 (2011).

Whether a contract exists depends on the intentions of the parties and is a question of fact. *Reimer v. Waldinger Corp.*, 265 Kan. 212, 214, 959 P.2d 914 (1998); *Augusta Bank & Trust v. Broomfield*, 231 Kan. 52, 60, 643 P.2d 100 (1982). However, when the legally relevant facts are undisputed, the existence and terms of a contract raise questions of law for the court's determination. *Nungesser v. Bryant*, 283 Kan. 550, 566, 153 P.3d 1277 (2007). Also, when the material facts are uncontroverted, an appellate court reviews summary judgment de novo. *Superior Boiler Works, Inc. v. Kimball*, 292 Kan. 885, 890, 259 P.3d 676 (2011).

In order to form a binding contract, there must be a meeting of the minds on all the essential elements. *Albers v. Nelson*, 248 Kan. 575, 580, 809 P.2d 1194 (1991). An unconditional and positive acceptance is required to form a contract; a conditional acceptance of a settlement offer is but a counteroffer, which does not create a contract. *Nungesser*, 283 Kan. 550, Syl. ¶ 5.

The standard of proof for demonstrating the existence of an oral contract is the preponderance of the evidence. *In re Estate of Stratmann*, 248 Kan. 197, 806 P.2d 459 (1991). In an action based on contract, the plaintiff bears the burden of proving the existence of the contract alleged in the petition. *Steele v. Harrison*, 220 Kan. 422, 428, 552 P.2d 957 (1976).

The terms of an oral contract and the consent of the parties may be proven by the parties' acts and by the attending circumstances, as well as by the words that the parties employed. *Quaney v. Tobyne*, 236 Kan. 201, Syl. ¶ 3, 689 P.2d 844 (1984). It is not necessary that a party expressly declare an admission of entering into an oral contract. *Tobyne*, 236 Kan. at 210.

Sandoval essentially contends that all of the communications about the terms of her resignation constituted nothing more than preliminary negotiations in preparation for a final, written settlement agreement. The District, on the other hand, maintains that

the communications produced a valid, enforceable separation contract.

Professors Arthur L. Corbin and Joseph M. Perillo discuss the distinguishing characteristics of preliminary negotiations and binding agreements in terms of the parties' intentions and their manifest expressions of agreement:

"The term 'preliminary negotiation' . . . may be used to include all those communications and other events in a bargaining transaction that are antecedent to acceptance, that is, antecedent to the completion of the contract. In this sense, every offer is a part of the negotiation that is preliminary to the making of a contract. Indeed, there may be more than one offer. In the preliminary haggling process, there are frequently offers and counteroffers, each one of which has a certain legal operation, but, none of which is transformed into a contract. To determine whether or not a bargaining transaction actually results in the making of a contract, courts must consider all of the preliminary negotiations, all of the offers and counteroffers, interpret the various expressions of the parties, and form a judgment as to whether they ever finally expressed themselves as in agreement on complete and definite terms.

. . . .

"In the process of negotiation a party may use words that standing alone would normally be understood to be words of 'contract,' at the same time limiting them in such a way as to show that a subsequent expression of assent on his or her part is required. In such a case the expression is neither an operative offer nor an operative acceptance. It is merely part of preliminary negotiation." 1 Corbin on Contracts § 2.1, pp. 100-01 (rev. ed. 1993).

Some evidence in the record, taken in isolation, supports the district court's determination that Sandoval formed a binding oral contract on March 10, 2008. The Court of Appeals relied on this standard of review in affirming the district court. This is, however, the incorrect standard for reviewing undisputed evidence in summary judgment motions and for determining whether a contract exists, which are questions of law. See *Superior Boiler Works*, 292 Kan. at 890; *Nungesser*, 283 Kan. at 566.

A number of factors mitigate against finding that the parties formed the intent to establish a contract.

First, the parties, through their agents, entered into subsequent discussions relating to modifications of the terms of the agreement, particularly with respect to confidentiality and custody of school and personal property. Although a contract may exist even though

the parties agree to resolve nonessential terms at a later time, and minor differences between an offer and an acceptance may not prevent the formation of a contract, there must be an acceptance of the exact terms of an offer, and the acceptance must be unconditional and unequivocal. *Nungesser*, 283 Kan. at 568. The fact that the parties continued to exchange communications demonstrates that the parties did not understand that they had reached a full meeting of the minds and had bound themselves and each other as of March 10.

Second, District policy stated that resignations would be considered if submitted in writing. This policy may have led Sandoval to the reasonable expectation that her acceptance of the board's offer would not become binding until she signed a written settlement agreement.

Third, the board did not accept Sandoval's resignation in open meeting, and the board's minutes did not mention Sandoval's resignation, even though the minutes expressly stated that another employee's resignation had been accepted. While a contract reached in violation of the Open Meetings Act is not inherently defective, see *Krider v. Board of Trustees of Coffeyville Community College*, 277 Kan. 244, Syl. ¶ 5, 83 P.3d 177 (2004), the absence of ratification in open meeting and the absence of the acceptance of Sandoval's resignation in the minutes are compelling evidence that the board did not intend the agreement to be final as of March 10.

Fourth, White signed an affidavit stating that in his many years of negotiating teacher resignations, the terms of resignation settlement agreements were always set out in writing. This testimony does not in itself belie the existence of an oral contract, but it suggests that there was no understanding by Sandoval that she would be bound by her oral communication of resignation, and there was therefore no meeting of the minds as to a binding contract as of March 10.

The board has failed to prove a meeting of the minds on all the essential elements of the negotiated terms and has failed to prove an unconditional and positive acceptance of the board's terms by Sandoval. The dialogue between the parties constituted nothing

more than preliminary negotiations and did not culminate in a binding contact, either on March 10 or at any later date.

Even assuming arguendo that the parties formed a contract on March 10, the uncontroverted facts presented in the motions for summary judgment established that the parties later mutually rescinded any such contract. The dissent maintains that repudiation was not specifically raised by Sandoval and that considering the issue violates our rules of appellate procedure. Applying legal consequences to uncontroverted facts is not prohibited by our rules, especially when the facts demonstrate so clearly that the board's actions were entirely inconsistent with the very terms they maintain were in force. The court is not required to reach the wrong conclusion when the parties do not advocate for the correct application of the law to the facts.

The parties to a contract may mutually rescind their contractual obligations. *Blakesley v. Johnson*, 227 Kan. 495, 501, 608 P.2d 908 (1980). We have specifically recognized that teachers and school districts may rescind their contractual agreements by conduct inconsistent with the continued existence of the contract. Mutual assent to abandon the contract may be inferred both from the parties' conduct and by the attendant circumstances. *Brinson v. District*, 223 Kan. 465, 474, 576 P.2d 602 (1978), *overruled on other grounds by Umbehr v. Board of Wabaunsee County Comm'rs*, 252 Kan. 30, Syl. ¶ 2, 843 P.2d 176 (1992).

Assuming a contract existed, an essential term of the contract required Sandoval to leave the classroom by March 28 in order to qualify for KPERS disability benefits. Nevertheless, the District provided no substitute teacher beginning on March 28 and did not inform Sandoval that she was not to come to the school and teach her classes as of that date. Instead, she finished her teaching duties for the year, and the District paid her salary for that term. The board sent her a letter informing her that it would nonrenew her contract, and on April 14, 2008, the board adopted a resolution of nonrenewal.

A contract ceases to be in force when it is rescinded by mutual consent, and the courts will treat a contract as abandoned when one party acquiesces to the acts of another party that are inconsis-

tent with the existence of a contract. See *Dickinson v. Lawrence Lodge*, 135 Kan. 87, 90, 9 P.2d 985 (1932). The actions by both the board and Sandoval were clearly inconsistent with the existence of a contract to terminate her employment as of March 28 and each acquiesced in the conduct of the other. Even if the parties formed the intent to be bound by an oral termination agreement, they both soon abandoned both that intent and the agreement.

The parties agree that the essential facts are uncontroverted. The conclusions of law that they—and judges applying the law to those facts—reach are, on the other hand, highly controverted. Applying law to agreed-upon facts is a proper function of this court; we see no purpose to be served by remanding this case to the district court to perform the same duty that we are able to perform at this level. We conclude as a matter of law that no enforceable contract exists between the parties.

The judgment of the Court of Appeals affirming the district court is reversed. The judgment of the district court is reversed.

\* \* \*

LUCKERT, J., concurring in part and dissenting in part: I agree with the majority's conclusion that the district court's and Court of Appeals' decisions should be reversed. But I disagree with the majority's position that it is appropriate to resolve this case on summary judgment. In my view, no party is entitled to summary judgment, and I would remand for further proceedings.

As the majority states, "Whether a contract exists depends on the intentions of the parties and is a question of fact." *Sandoval*, slip op. at 6 (citing *Reimer v. The Waldinger Corp.*, 265 Kan. 212, 214, 959 P.2d 914 [1998]; *Augusta Bank & Trust v. Broomfield*, 231 Kan. 52, 60, 643 P.2d 100 [1982]). This court has also stated that "courts should be cautious in granting summary judgment where the issues in the case, as here, involve questions of the intent of the parties." *Noller v. General Motors Corp.*, 244 Kan. 612, 617, 772 P.2d 271 (1989).

In the present case, while there are many uncontroverted facts, the question of whether the parties intended to form a contract on March 10, 2008, is highly controverted and is material—indeed,

essential—to the resolution of the parties' dispute. The parties, in their cross-motions for summary judgment, present several uncontroverted facts but avoid making a factual statement regarding the parties' intent. They then argue diametric positions regarding how the uncontroverted facts they have presented should be weighed to resolve the controverted issue of intent. In my view, the district court, Court of Appeals, and Chief Justice weighed these facts to come to the conclusion the parties intended to form a contract on March 10, 2008, and the majority weighed the facts to come to the opposite conclusion.

Yet, a court does not weigh facts on summary judgment. Indeed, this court has warned that both district and appellate courts considering motions for summary judgment "must refrain from the temptation to 'pass on credibility and to balance and weigh evidence,' which are proper functions for the factfinder at trial. [Citation omitted.]" *Esquivel v. Watters*, 286 Kan. 292, 295-96, 183 P.3d 847 (2008). Where a disputed issue, such as the intent issue in the present case, must be determined " ' "[s]ummary judgment should not be used to prevent the necessary examination of conflicting testimony and credibility in the crucible of a trial.' " [Citations omitted.]" *Esquivel*, 286 Kan. at 296. Moreover, as the Chief Justice notes in his dissent, there are many unanswered questions that could be explored in discovery.

Given the conflicting positions of the parties, it is telling that the majority reaches one conclusion while the Chief Justice, the three members of the Court of Appeals panel, and the district judge reached the opposite conclusion. Given this, I would follow the advice we have given in the past: "[W]here we find reasonable minds could differ as to the conclusions drawn from the evidence, summary judgment must be denied. [Citations omitted.]" *Shamberg, Johnson & Bergman, Chtd. v. Oliver*, 289 Kan. 891, 900, 220 P.3d 333 (2009).

Additionally, the majority, in discussing rescission as an alternative basis for its decision, considers an issue that the parties have not argued. In doing so, the majority spins the facts to support its conclusion that the school district's actions demonstrated its assent to Deborah Sandoval's rescission of an oral contract. This conclu-

sion is procedurally premature because the parties have not argued the possible inferences that could be drawn from these actions. Other explanations—such as mitigation of damages, demands of due process, and 2007-08 contractual restrictions that limited the school district's options—are plausible. Additionally, the majority ignores the record before the district court and on appeal, which includes the following uncontroverted statement of fact:

"Once notified that Ms. Sandoval would not honor the March 10, 2008, agreement, the Board adopted a nonrenewal resolution on April 14, 2008 but expressly reserved the right to enforce the oral agreement reached on March 10, 2008. It was always the intent of the Board to honor and enforce the agreement made on March 10, 2008."

In light of Sandoval's failure to controvert this statement for purposes of the summary judgment motion considered in this appeal, we must accept that the Board did not agree to a rescission. The majority cannot weigh the facts to reach the opposite conclusion.

I would reverse the district court and the Court of Appeals and would remand to allow the trier of facts to weigh the evidence after it is tested at trial.

\* \* \*

NUSS, C.J., dissenting: I respectfully dissent. The uncontroverted facts establish the parties entered into a binding oral contract on March 10, 2008.

### BINDING ORAL CONTRACT

It is uncontroverted that on March 10, the Board of Education of Unified School District No. 446 was in executive session considering whether that night it would either (1) pass a resolution to nonrenew Deborah Sandoval's teaching contract for the upcoming school year or (2) allow her to voluntarily leave its employ via a negotiated settlement. It is further uncontroverted that offers and counteroffers were exchanged until Sandoval eventually accepted the board's "last proposal."

It is uncontroverted that Sandoval told her negotiating agent, Kansas National Education Association (KNEA) UniServ Director,

Tony White, "to accept the proposal," and that White in turn told Superintendent Chuck Schmidt that Sandoval "would accept the offer." Schmidt then told the board.

The majority opinion accurately sets forth the precise, uncontroverted terms of the accepted offer:

"180 days of paid leave to qualify for KPERS disability benefits, which would require her to leave the classroom on March 28, 2008: paid insurance on the bottom tier for 5 years; and a lump sum payment of $20,000 in the event that she did not qualify for disability benefits."

Under these facts, a contract typically would be formed because "the formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration." Restatement (Second) of Contracts § 17 (1981). More particularly, "The manifestation of mutual assent to an exchange ordinarily takes the form of an offer or proposal by one party followed by an acceptance by the other party or parties." Restatement (Second) of Contracts § 22(1) (1981). See *Southwest & Assocs., Inc. v. Steven Enterprises*, 32 Kan. App. 2d 778, 781, 88 P.3d 1246 (2004) (Each party must accept the essential terms of the contract and outwardly communicate the acceptance in a way reasonably intended to be understood as such; law of contracts refers to that mutual acceptance as a "meeting of the minds."). And as is required for a meeting of the minds, here the uncontroverted evidence clearly established " ' "with reasonable definiteness that the minds of the parties met upon the same matter and agreed upon the terms of the contract." ' " *Price v. Grimes*, 234 Kan. 898, 904, 677 P.2d 969 (1984).

Nevertheless, the majority adopts Sandoval's argument that these all represent only preliminary negotiations and that no contract would be created until a formal written contract was executed. But its conclusion is contradicted by both parties' conduct and interpretation immediately after the board learned of Sandoval's acceptance of its offer. This warrants careful consideration because:

"The subsequent conduct and interpretation of the parties themselves *may be decisive* of the question of whether a contract has been made even though a

document was contemplated and has never been executed." (Emphasis added.) *King v. Wenger*, 219 Kan. 668, 672, 549 P.2d 986 (1976).

Accord 1 Corbin on Contracts § 2.9, p. 154 (rev. ed. 1993).

Here, it is uncontroverted that the board considered it had a binding oral contract and that in reliance on Sandoval's acceptance of its last offer, it took no action on the nonrenewal resolution proposed for passage that night. Schmidt swears that "[h]aving reached a settlement, the executive session then recessed [and returned to open session]. Because Ms. Sandoval agreed to resign as part of the settlement, the board of education relied thereon and did not take action on the nonrenewal resolution." Board president Farthing similarly swears that "[a]s a result of the verbal agreement, the board took no action on the Resolution for Non-Renewal of Ms. Sandoval. When the meeting adjourned, the board of education felt that it had a solid, enforceable verbal agreement . . . ."

Stated in the language of standard contract law, the board immediately began its performance of the oral contract when that night—March 10—it removed the barrier of its imminent nonrenewal so Sandoval could voluntarily leave her employment by March 28 per the agreement. Such partial performance of a contract can be significant evidence of contract formation. See *R.G. Group, Inc. v. Horn & Hardart Co.*, 751 F.2d 69, 75 (2d Cir. 1983) (partial performance is of "major significance"); *cf. Miles v. City of Wichita*, 175 Kan. 723, 727, 267 P.2d 943 (1954) (company moved its equipment onto land and began removing sand under purported oral contract; accordingly, "the [later] preparation and execution of the written lease was but little more than a clerical act"). Even more compelling evidence of contract formation exists when one party's partial performance "has been accepted by the party disclaiming the contract." *R.G. Group, Inc.*, 751 F.2d at 75.

In *R.G. Group, Inc.*, the Second Circuit aptly summarized the importance of both factors: (1) acceptance of (2) partial performance. "Aside from unilateral contracts, partial performance is *an unmistakable signal* that one party believes there is a contract; and the party who accepts performance signals, by that act, *that it also understands a contract to be in effect.*" (Emphasis added.) 751 F.2d at 75-76.

In agreement is 1 Williston on Contracts § 4:11, pp. 513-14, (4th ed. 2007), which states in relevant part:

*"Certainly, acts of performance by one party accepted by the other indicate that the parties understand that definite terms have been agreed upon. As such, even* if the oral agreement prior to the act of performance did not constitute a contract, the subsequent tender of performance would amount to an offer, and the receipt of the performance without objection would operate as an acceptance of the offer." (Emphasis added.)

To identify Sandoval's acceptance of the board's partial performance, I first observe that White's affidavit repeatedly reveals he knew exactly what was at stake for his client: settle with the board that night or experience immediate nonrenewal. For example, he swears that earlier that day he and Sandoval met Schmidt "and presented *a package proposal that would forestall the nonrenewal."* He further swears that at the later board meeting, Schmidt told him that "[i]f Ms. Sandoval did not accept the offer at the end of five minutes, the Board would come back into open session and nonrenew Ms. Sandoval's employment contract." The majority opinion correctly acknowledges that White had "many years of negotiating teacher resignations."

Accordingly, when Sandoval accepted the board' resignation alternative, the experienced White would have known that the alternative threatening imminent nonrenewal would be removed by the board yet that night. And his affidavit bears this out. After White told Schmidt of Sandoval's acceptance of the board's offer and Schmidt in turn told the board, according to White's affidavit White then watched as "[t]he Board returned to open session and adjourned without taking any action," *i.e.*, passing the nonrenewal resolution. In other words, White chose to remain present and accept the board's partial performance of the oral contract.

After choosing to witness and accept this partial performance, White reinforced the existence of the oral contract by taking immediate action. His affidavit provides that "[i]*mmediately* after the Board meeting adjourned [without the nonrenewal], I approached Mr. Schmidt and asked him how we wanted to handle the *written* settlement agreement . . . I told him that KNEA had some standard

language we used in due process cases and could prepare something *quickly*." (Emphasis added.)

If all of the preceding had merely been preliminary negotiations—suggesting more would follow before finalization—there would seem to be no need for White's professed urgency to prepare a written agreement. Instead, his admitted "immediate" action and chosen language ("quickly") further demonstrates that an oral settlement agreement already had been formed. Indeed, that night White expressed absolutely nothing, by word or deed, to the board or Schmidt, even remotely suggesting a binding oral contract had not been reached.

Moreover, even when White spoke with Schmidt several days later, it was not to tell Schmidt there was no binding contract reached on March 10. Rather, it was to say Sandoval simply "changed [her] mind." She swears that "[o]n Wednesday March 12 I told Tim Knoles [local NEA leader] that I had changed my mind and wanted to go through with a due process hearing" challenging the now-anticipated nonrenewal of her contract. Her acknowledgment of the resulting due process hearing establishes that, like White, she had known on March 10 that she would either settle that night or be immediately nonrenewed.

These actions by the parties, and the timing of their actions, compel me to consider it a binding oral contract.

The majority suggests, in another context, that the board's failure to remove Sandoval from her classroom by March 28 indicates the board acted inconsistently with the terms of the oral contract it wants to enforce. As Justice Luckert points out, however, it is uncontroverted that the board's nonrenewal resolution "expressly reserved the right to enforce the oral agreement" and "[i]t was always the intent of the Board to honor and enforce the agreement made on March 10, 2008."

I now address the factors the majority cites to conclude no oral contract existed.

1. *Subsequent discussions.*

The majority holds that the parties' exchange of communications after March 10 demonstrates they did not understand that they

had reached a full meeting of the minds that day. Admittedly White and Schmidt discussed additional terms after Sandoval's acceptance of the board's offer. But as the majority admits, "an enforceable contract may exist despite the parties' agreement to resolve nonessential terms at a later time." *Nungesser v. Bryant*, 283 Kan. 550, 567, 153 P.3d 1277 (2007). And a contract may exist where "the parties express definite agreement on all necessary terms, and say nothing as to other relevant matters that are not essential but that other people often include in similar contracts." Corbin § 2.9, p. 158.

Based upon the parties' other actions, it is extremely difficult to label these later, additional terms as essential to forming any contract. First, it is uncontroverted that the present dispute was not caused because the parties failed to agree on these purportedly essential new terms but because Sandoval, after agreeing to resign, simply changed her mind. She certainly provided no reasons, *e.g.*, refusing to agree to these new terms. Second, given White's manifest acceptance of the board's partial performance of the oral contract on March 10 before these additional terms were even identified, coupled with his uncontroverted alacrity that same night in wanting the oral agreement "quickly" reduced to writing, it is obvious he did not consider these later terms essential to forming a contract. One had already been made.

I readily conclude the terms were not essential and they therefore do not serve to dilute my conclusion that the contract had been formed on March 10.

## 2. *District policy on resignations.*

The majority next holds that because District policy stated resignations would be considered if submitted in writing, Sandoval may have been led to reasonably expect "that her acceptance of the board's offer would not become binding until she signed a written settlement agreement." But Sandoval's affidavit is silent regarding her knowledge of this policy.

Even if she were knowledgeable, under similar reasoning the board could claim it was not bound to pay Sandoval the sums owed under the settlement until she actually left "the classroom on

March 28th, 2008." The board's receipt of her eventual written resignation, like her leaving by March 28, is simply a step in the execution of the terms of the binding oral contract formed on March 10.

### 3. *Absence of matters in open session and minutes.*

The majority next holds that (1) the absence of board ratification of the purported oral contract—acceptance of Sandoval's resignation—in open session on March 10, and (2) the absence in the board meeting minutes of its acceptance of her resignation "are compelling evidence that the board did not intend the agreement to be final as of March 10."

Schmidt informed the board in executive session of Sandoval's acceptance of its final offer. The affidavits confirm that the board and superintendent all believed an oral contract was reached in executive session. So the board recessed into open session and adjourned the meeting. And as a matter of basic contract law, the board and its superintendent were correct: nothing remained for the board to do to form a binding contract. See Restatement (Second) of Contracts, § 17(1) (1981) (the formation of a contract requires a bargain in which there is a manifestation of mutual assent to the exchange and a consideration); *Southwest & Assocs., Inc. v. Steven Enterprises*, 32 Kan. App. 2d 778, 781, 88 P.3d 1246 (2004) (each party must accept the essential terms of the contract and outwardly communicate the acceptance in a way reasonably intended to be understood as such).

And under long-standing Kansas caselaw, contract action taken in executive session—although in violation of the Kansas Open Meetings Act (KOMA), K.S.A. 75-4317 *et seq.*—is nevertheless binding on the parties absent prosecutorial action to void it. See *Krider v. Board of Trustees of Coffeyville Community College*, 277 Kan. 244, 247-49, 83 P.3d 177 (2004) (notice of nonrenewal of tenured college instructor's contract was not voided because board's vote taken in executive session); *City of Topeka v. Watertower Place Dev. Group*, 265 Kan. 148, 156-57, 959 P.2d 894 (1998); *Stoldt v. City of Toronto*, 234 Kan. 957, 962-63, 678 P.2d 153 (1984).

Because nothing more needed to be done in executive session to make the oral contract binding little, if any, weight should be given to the board's later failure to repeat itself in open session. And actions taken in executive session—binding or not, made improperly or not—are not among the subjects KOMA requires to be recorded in the meeting minutes. See K.S.A. 75-4319(a). Accordingly, little, if any, weight should be given to the resignation's absence in the minutes.

*4. White's affidavit testimony.*

The majority further points to White's affidavit testimony "that in his many years of negotiating teacher resignations, the terms of resignation settlement agreements were always set out in writing." It suggests Sandoval therefore did not understand "that she would be bound by her oral communication of resignation" and so there was no meeting of the minds. But as with the majority's factor 2, Sandoval's affidavit is silent—about her own understanding or expectation that a contract needed to be in writing in order to bind her or that it otherwise entered into the calculus of her change of mind about her acceptance of the board's offer.

I also agree with the Court of Appeals that "[n]othing in the record on appeal indicates that the agreement was *conditioned* upon the subsequent execution of a formal written instrument." (Emphasis added.) *U.S.D. No. 446 v. Sandoval*, No. 101,145, 2009 WL 2766751, at *4 (Kan. App. 2009) (unpublished opinion). Indeed, Schmidt's affidavit provides that he and White "were simply memorializing the oral agreement." And this court has held "[t]he fact that the parties [to an oral contract] contemplate the subsequent execution of a formal instrument as evidence of their agreement does not necessarily imply they have not already bound themselves to a definite and enforceable contract." *Phillips & Easton Supply Co., Inc. v. Eleanor International, Inc.*, 212 Kan. 730, 735, 512 P.2d 379 (1973) (citing *Willey v. Goulding*, 99 Kan. 323, 161 P. 611 [1916]); *Middleton v. City of Emporia*, 106 Kan. 107, 186 P. 981 (1920); see Restatement (Second) of Contracts § 27 (1981) ("[M]anifestations of assent that are in themselves sufficient to conclude a contract will not be prevented from so operating by the

fact that the parties also manifest an intention to prepare and adopt a written memorial thereof.").

In sum, my view of the uncontroverted evidence establishes a binding oral contract was formed on March 10. I therefore would affirm the district court's grant of summary judgment for the board.

But if contract formation is not certain, then reversal and remand for more factual development is required. Further discovery would reveal what White intended on March 10 if not to accept the board's partial performance of an oral contract. More particularly, the parties might explore why White had not offered to draft the written agreement at the time he was also advising Schmidt of Sandoval's acceptance of the offer—instead of offering after the board had removed the imminent nonrenewal and adjourned the meeting. *Reimer v. The Waldinger Corp.*, 265 Kan. 212, 214, 959 P.2d 914 (1998) ("The question whether a binding contract was entered into depends on the intention of the parties and is a question of fact.").

## SECOND BASIS NOT PROPERLY BEFORE THIS COURT

I also respectfully dissent from the majority's second basis for granting judgment in favor of Sandoval. Specifically, it states that even assuming the parties formed a contract on March 10, the uncontroverted evidence establishes that they later mutually rescinded any such contract. For example, it points out the board allowed her to finish her teaching duties for the year and paid her salary.

My principal problem with this approach is that the mutual rescission issue was not raised in Sandoval's brief or identified in her petition for review. Her only "Statement of the issue for which review is sought" is presented as follows:

"The parties did not intend to enter into an agreement without board action."

Nor did the board file any cross-petition for review on any issue.

Considering the issue of mutual rescission violates our rules of appellate procedure and is contrary to our case law. See *State v. Sanchez-Loredo*, 294 Kan. 50, 53, 272 P.3d 34 (2012) (citing rules and caselaw). The majority self-exempts from these restrictions by

merely declaring that it "is not required to reach the wrong conclusion when the parties do not advocate for the correct application of the law to the facts."

But this declaration misses the point. Our own rules and caselaw do not require that the wrong conclusion be reached. Rather, they require that *no* conclusion be reached because the issue that would require a conclusion will not be addressed by this court—absent certain narrow exceptions which are not mentioned by the majority or applicable here. See *State v. Puckett*, 230 Kan. 596, Syl. ¶ 1, 640 P.2d 1198 (1982) (stating the general rule and describing the exceptions).

Additionally, if under a *Puckett* exception we no longer require the parties to raise certain arguments at any stage of the proceedings because we will make the arguments ourselves, and if we will decide the case on the basis of our own arguments without allowing the parties input, we are on our way to eliminating any incentive for anyone to raise, much less address, any issues—because this court will do it all. Even in *State v. Puckett*, where an exception applied to permit this court to raise an issue on its own, we still held:

"[W]here an appellate court raises a new issue sua sponte, counsel for all parties should be afforded a fair opportunity to brief the new issue and to present their positions to the appellate court before the issue is finally determined." 230 Kan. at 601.

For these reasons, I would affirm the district court and the Court of Appeals.