NOT DESIGNATED FOR PUBLICATION

No. 113,780

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

RON DeHAEMERS,
*Appellant*,

v.

BENJAMIN T. DeHAEMERS and DENISE T. DeHAEMERS,
*Appellees*.

MEMORANDUM OPINION

Appeal from Johnson District Court; DAVID W. HAUBER, judge. Opinion filed May 27, 2016.
Affirmed.

*David K. Martin*, of Payne & Jones, Chartered, of Overland Park, for appellant.

*D. Todd Arney* and *Allison G. Kort*, of Kreamer, Kincaid, Taylor, Lipsman, Parks & Arney, LC,
of Overland Park, for appellees.

Before POWELL, P.J., ARNOLD-BURGER, J., and BURGESS, S.J.

*Per Curiam*: Ron DeHaemers (Ron) sued his son, Benjamin DeHaemers (Ben),
alleging a breach of contract for repayment of a $225,000 loan to save Ben's home from
foreclosure. Around the same time Ron also filed a grandparent visitation case involving
Ben's daughter. After a bench trial, the district court held that Ron failed to maintain his
burden that there was a contract and, thus, no breach of contract cause of action could be
sustained. Ron appeals, arguing (1) the district court erred in referencing the pending
grandparent visitation case and (2) the district court's conclusion that the money was a
gift rather than a loan was not supported by substantial competent evidence. We affirm.

1

This case involves a complex factual situation and long history between Ron and Ben. It begins with a foreclosure judgment on Ben's house that was entered in February 2010 for $220,796.28. Between February 2010 and April 2011, the foreclosure sale was ordered and subsequently cancelled seven different times. Because of this instability, Ben, along with his wife and daughter, moved into an apartment. However, Ben could not pass a credit check for the lease of the apartment due to the foreclosure on his home, so Ron prepaid 8 months' rent for the apartment, totaling $10,000. Ben paid Ron $1,250 per month and satisfied the loan of $10,000.

Ron testified that while Ben and his family were living in the apartment he offered to pay the mortgage amount to get the family back in their home. Ben testified that

"his father brought up the payoff unilaterally when he told [Ben] to 'get me a number.' [Ben] said he said, 'what do you mean get me a number?' [Ben] said his father did not say at that time that he was going to do it. Later, when he got the number, [Ben] testified, he asked his father 'what do you want this number for, he says, "Well, we need to make these people go away." And I assumed it would be a loan I said, "I am not getting into a loan situation with you at all." That is an extremely bad idea I even told him.'

"[Ben] also testified that [Ron] said: 'No, no he told me he just wanted to do it and I said I'm not getting into a loan situation' when his father reassured him that it was not a loan but that it . . . would be '"your money it's come [*sic*] to you later. But we need to do this now."'"

It is not disputed that Ron gave Ben $225,000 in April 2011. Ben then paid off the mortgage of $220,796.28 with a cashier's check. According to Ron, the excess funds were supposed to be returned to him after the mortgage was paid, but Ben kept the excess for

home improvements. Ben testified that they agreed the extra could be used for home improvements, as the condition of the home was of concern to Ben and Ron.

Ron testified he knew Ben would not be able to get a loan in the short term, so the parties agreed that Ben would continue to pay $1,250 per month until Ben could obtain a new mortgage. Ben made payments of $1,250 beginning in September 2011 and continuing for 11 payments. Six of the checks had memo notations indicating the month in which they were paid; the other checks had no memo notation. Ron contends the parties reached an oral agreement on a promissory note for repayment of $225,000, plus consequential loss of earning power by the withdrawn mutual funds that he would have retained had he not withdrawn the funds. Ben testified that these payments were not for a loan arrangement but rather were "forced savings." The $225,000 was all of the inheritance Ben would receive from his father. Ben testified Ron said he could better manage Ben's money, so Ben continued to send his father $1,250 to invest. Ben repeatedly testified that he was never willing to get into any kind of loan with his father and said his father insisted on paying off the loan so his granddaughter could have a consistent home and room of her own.

Both parties agreed the event that led to the rift in their relationship occurred on July 5, 2013. Ron testified that Ben approached him about modifying the payments from $1,250 per month to $850 per month, which resulted in an argument. Ben yelled at Ron that Ron would never see Ben or his granddaughter again, that Ron would have to find his own way to his doctor appointment, and not to call because Ben would be blocking Ron's phone number. Ron called 911 and told the dispatcher that he had loaned Ben money to pay off his mortgage and that his son said he could not pay. Not surprisingly, Ben's version differed. Ben testified he did not bring up the payments during this confrontation. Rather, he claimed he confronted his father because Ron made inappropriate comments to Ben's daughter about their finances and yelled at her after she

3

asked her grandfather to pay for horseback riding lessons. Either way, the disagreement involved Ron's relationship with his granddaughter.

After this dispute, Ron was not allowed contact with his granddaughter. In November 2013, Ron filed a grandparent visitation suit followed by the present breach of contract action in March 2014. Ron's petition included causes of action for breach of contract, unjust enrichment, and equitable mortgage.

The district court held that Ron failed to maintain his burden at trial to prove that a contract existed because he failed to prove there had been a meeting of the minds and there was no writing in evidence to suggest the parties had agreed to any loan relationship. The district court stated:

> "For all the Court can discern, [Ron] may have been seeking some recompense for having to remove mutual funds to pay off the mortgage, although he did not seek repaying of the payoff itself. In either event, the parties failed to define their relationship in any meaningful manner that allows for a finding of any meeting of the minds."

Ron timely appeals the district court's ruling on his breach of contract claim but does not appeal the district court's rejection of the other causes of action contained in his petition.

### DID THE DISTRICT COURT ERR IN REFERENCING THE PENDING GRANDPARENT VISITATION CASE?

Ron first argues that the district court's numerous references to the pending grandparent visitation case between the parties was clearly erroneous because (1) the case was not presented as evidence at trial and (2) the district court drew invalid inferences from the pending grandparent visitation case.

4

The same standard of review governs resolution of both arguments. We review the trial court's findings of fact to determine if the findings were supported by substantial competent evidence and were sufficient to support the trial court's conclusions of law. *Hodges v. Johnson*, 288 Kan. 56, 65, 199 P.3d 1251 (2009). "Substantial evidence is such legal and relevant evidence as a reasonable person might accept as sufficient to support a conclusion." *Owen Lumber Co. v. Chartrand*, 283 Kan. 911, 916, 157 P.3d 1109 (2007). "In determining whether substantial competent evidence supports the district court findings, appellate courts disregard any conflicting evidence or other inferences that might be drawn from the evidence. [Citation omitted.]" *Gannon v. State*, 298 Kan. 1107, 1175-76, 319 P.3d 1196 (2014). Such findings of fact "will not be set aside unless clearly erroneous." *Koch Engineering Co. v. Faulconer*, 239 Kan. 101, 104, 716 P.2d 180 (1986). The district court's "conclusions of law based on those findings are subject to unlimited review." *Gannon*, 298 Kan. at 1176.

1.      *Was the pending grandparent visitation case not in evidence at trial?*

Ron argues that the discussion of the pending grandparent visitation case between Ron and Ben was clearly erroneous because the grandparent visitation case was not in evidence. In support of this argument, Ron cites *In re Reed*, 8 Kan. App. 2d 602, 663 P.2d 675 (1983), *disapproved of on other grounds by In re B.D.-Y.*, 286 Kan. 686, 705, 187 P.3d 594 (2008) (modifying the standard of review for factfinder determinations required to be "based upon clear and convincing evidence [to] one similar to that applied to sufficiency questions in criminal cases"). In *Reed*, another panel of this court held that "evidence taken at, and the orders issued after, previous hearings were not competent proof of [mother's] parental fitness" as of the date of severance of parental rights; therefore, severance was not supported by substantial competent evidence. 8 Kan. App. 2d at 606.

*Reed* differs from the case at hand. While the home study reports in *Reed* were hearsay and did not qualify for admission as evidence under any exception, here the grandparent visitation case was in evidence. See 8 Kan. App. 2d at 606. Ron stated at trial that his demand letter to Ben discussed the alleged loan and wanting to reestablish his grandparent relationship with Ben's daughter. Ron also discussed the grandparent visitation case at trial. While the district court here referenced that case's existence, it did not rely on the validity of the underlying claims or arguments in determining whether the $225,000 was a loan or a gift and it did not rely on the case's existence when determining Ron's credibility. The court simply described the procedural posture of the case that all parties acknowledged existed and discussed at trial.

2.  *Did the district court draw invalid inferences from the pending grandparent visitation case?*

"Although reasonable inferences may be drawn from the facts and conditions shown, they cannot be drawn from facts or conditions merely imagined or assumed." *Jewett v. Miller*, 46 Kan. App. 2d 346, Syl. ¶ 4, 263 P.3d 188 (2011).

The inferences the district court made surrounding the pending grandparent visitation case were not drawn from facts or conditions merely assumed. Both parties testified that after the confrontation between Ron and Ben surrounding Ben's daughter and the subsequent 911 call, Ron's contact with his granddaughter ceased. The grandparent visitation case was filed in November 2013 and had not yet been resolved at the time the present breach of contract suit was filed in March 2014. The district court stated: "The Court infers that there . . . is a strong connection between the filing of the instant case and the unsatisfactory resolution of the grandparent visitation case, by which [Ron] has not been able to see his granddaughter." The district court further stated:

6

"Indeed, when the Court watched [Ron] testify and discuss his granddaughter, it was apparent that he held strong emotions about his ability to see her because he had attended to her and taken care of her in the past and wanted to resume that connection. . . . [Ron] attributed a breakdown in the parties' communication over money with a threat by his son . . . that [Ron] never would see his granddaughter again. [Ben], however, denies making such a threat. . . . The fact that [Ron], however, attributes such a statement to his son suggests a strong connection between the money dispute and the continued relationship with his granddaughter.

". . . This motivation, the Court discerns, plays out in a number of instances throughout the testimony in the trial over repayment of the 'loan' that [Ron] says he made to his son and daughter-in-law. Thus, it was not until late 2013 that any kind of lawsuit was filed over the argument that occurred on July 5, 2013, after which time, [Ron] testified, he has not been able to see his granddaughter."

The district court's inferences were logical and drawn from facts not assumed or imagined. Therefore, it was not clearly erroneous to discuss the procedural posture of the pending grandparent adoption case and draw inferences from the facts surrounding the grandparent visitation case that were in evidence at trial.

WAS THE DISTRICT COURT'S CONCLUSION THAT THE MONEY WAS A GIFT SUPPORTED BY SUBSTANTIAL COMPETENT EVIDENCE?

Ron also argues that the district court's decision that the $225,000 was a gift is not based on substantial competent evidence. Specifically, he argues the district court failed to consider checks written by Ben to Ron and Ron's 911 call.

The determination of whether the money transferred to Ben was a gift is a question of fact. See *In re Estate of Button*, 17 Kan. App. 2d 11, 13, 830 P.2d 1216, *rev. denied* 251 Kan. 938 (1992). As our standard of review stated above suggests, our review of the district court's factual findings are highly deferential.

7

The essence of Ron's claim is that Ben breached their alleged repayment agreement for the $225,000. Typically, a plaintiff alleging a breach of contract is required to prove "(1) execution and existence of the contract alleged in the petition; (2) sufficient consideration to support the contract; (3) performance or willingness to perform in compliance with the contract alleged; and (4) the defendant's breach insofar as such matters are in issue." *Commercial Credit Corporation v. Harris*, 212 Kan. 310, Syl. ¶ 2, 510 P.2d 1322 (1973); see also *City of Andover v. Southwestern Bell Telephone*, 37 Kan. App. 2d 358, 362, 153 P.3d 561 (2007) (quoting essential elements of contract from PIK Civ. 3d 124.01-A).

A plaintiff bringing a cause of action on an oral contract bears the burden of proving the contract's existence by a preponderance of the evidence. *U.S.D. No. 446 v. Sandoval*, 295 Kan. 278, 282, 286 P.3d 542 (2012). "The terms of an oral contract and the consent of the parties may be proven by the parties' acts and by the attending circumstances, as well as by the words that the parties employed. [Citation omitted.]" 295 Kan. at 282. A binding contract requires "a meeting of the minds on all the essential elements." 295 Kan. at 282.

Here, the district court held there was no contract and found the parties failed to define their relationship in any meaningful manner that allowed for a finding of any meeting of the minds. Based on a review of the district court's factual findings, it is unclear if Ben and Ron ever orally agreed there was a loan, and there are no writings indicating such a relationship. What is clear is that Ron failed to meet his burden that a contract existed based on a preponderance of the evidence. Ben stated the checks to Ron were for Ron to manage Ben's money. Ron told Ben that the $225,000 payoff of the mortgage was an advance on his inheritance, that Ben needed to be saving, and that Ron could better manage Ben's money. There was no writing in evidence to suggest that the parties agreed to any loan relationship or an oral agreement.

8

Ron contends that the district court erred because it did not consider the checks from Ben to Ron and Ron's 911 call. However, the district court detailed each of the written checks since August 2011. Ron's testimony was that the checks were payments for a loan, and Ben's was to the contrary. "[A]ppellate courts do not reweigh evidence or pass upon the credibility of witnesses." *Peterson v. Ferrell*, 302 Kan. 99, 106-07, 349 P.3d 1269 (2015). The district court found Ben's testimony to be more credible, and it is beyond our power to alter such a finding.

Additionally, the district court reviewed and considered the 911 call. The 911 call was similar to Ron's testimony in that he stated he loaned Ben money and Ben was refusing to repay. Again, the district court found Ben's testimony that the money was not a loan more credible than Ron's testimony to the contrary. Just because the district court's review of the checks and the 911 call did not produce a result Ron desired does not mean they were not considered. It is clear to us that the district court considered the checks and the 911 call and concluded there was no oral contract because there was no meeting of the minds. Such findings were based on substantial competent evidence.

Affirmed.