NOT DESIGNATED FOR PUBLICATION

No. 127,821

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

JAMES HAMILTON, d/b/a THE LAWN WIZARD,
*Appellant*,

v.

HOUSING AUTHORITY OF THE CITY OF MANHATTAN, KANSAS,
*Appellee*.

MEMORANDUM OPINION

Appeal from Riley District Court; JEREMY LARCHICK, magistrate judge. Submitted without oral argument. Opinion filed February 28, 2025. Reversed and remanded with directions.

*Doug Thompson*, of Thompson Law Office, of Chapman, for appellant.

*Michael K. Hobbs*, of Sanders Warren & Russell LLP, of Overland Park, for appellee.

Before ARNOLD-BURGER, C.J., HILL and WARNER, JJ.

PER CURIAM: This is a breach-of-contract action between James Hamilton and the Housing Authority of the City of Manhattan. The Housing Authority contracted with Hamilton's lawn company to provide mowing services from April through November 2022. The parties' agreement stated that the Housing Authority would pay the cost included in Hamilton's price quote, and Hamilton provided a document—signed by the Housing Authority's executive director—that stated the price of the work would be $33,120, paid in 12 monthly installments of $2,760.

Everything went according to plan until November. But once Hamilton had completed all the lawn services called for under the agreement, the Housing Authority informed Hamilton that it was terminating the contract and would not pay the remaining installments. Hamilton sued the Housing Authority to recover the amount that he had not yet been paid.

After a bench trial, the court found that the contract allowed the Housing Authority to terminate the agreement at its convenience at any time and it was excused from making any further payments. We disagree with the trial court's second conclusion—the agreement excuses only payments for services that *had not yet been performed*. Hamilton completed all the work he had agreed to do. He is entitled to payment for those services. We thus reverse the trial court's decision and remand for entry of judgment in Hamilton's favor.

FACTUAL AND PROCEDURAL BACKGROUND

In 2022, the Housing Authority entered into a contract with The Lawn Wizard, a company owned and operated by Hamilton, to perform lawn care for the year. Hamilton provided those mowing services without incident. In early November 2022, after Hamilton had completed the services for the year, the Housing Authority terminated the contract. This lawsuit followed to determine what—if anything—the Housing Authority continued to owe Hamilton for his completed work.

*The Terms of the Agreement*

Hamilton and the Housing Authority—through its Executive Director, Aaron Estabrook—signed a written contract for lawn-care services on March 14, 2022. The contract's Scope of Work indicated that Hamilton would provide mowing and other lawn

2

services (bagging lawn clippings, spraying of weeds, trimming, and pruning) at six locations in Manhattan.

The contract did not contain a timeline for when these services were to occur or a specific amount that the Housing Authority would pay for them. Instead, it stated that the Housing Authority agreed to pay Hamilton "in accordance with the contractor[']s price quotes, subject to the requirements as provided in Form HUD-5370-C, Part II, General Conditions for Contracts For Non-Construction Contracts"—terms that were required for all contracts involving entities that received federal funding from the United States Department of Housing and Urban Development (HUD). The HUD Conditions included a termination clause that has become the focus of this lawsuit. Under this clause, the Housing Authority could terminate the contract for "cause/default" or for "convenience":

"(a) The PHA [public housing authority] may terminate this contract in whole, or from time to time in part, for the PHA's convenience or the failure of the Contractor to fulfill the contract obligations (cause/default). The PHA shall terminate by delivering to the Contractor a written Notice of Termination specifying the nature, extent, and effective date of the termination. Upon receipt of the notice, the Contractor shall: (l) immediately discontinue all services affected (unless the notice directs otherwise), and (2) deliver to the PHA all information, reports, papers, and other materials accumulated or generated in performing the contract, whether completed or in process.

"(b) If the termination is for the convenience of the PHA, the PHA shall be liable only for payment for services rendered before the effective date of the termination."

Within a day or so of signing the contract, Hamilton provided a document to the Housing Authority with the price for his services and laying out expectations for his work. The parties now dispute the legal import of that document, but their disagreement is largely semantic: Hamilton asserts that the document was a second contract that clarified the first contract's terms; the Housing Authority asserts that the document was

the "contractor[']s price quotes" referenced in the earlier contract and did not impose any additional terms to or otherwise alter the parties' agreement.

The first page of this document stated that the "[p]roposed contract period" ran from April 1, 2022, through April 31, 2023, and indicated that lawn services would be performed on the six locations previously indicated. The document stated that Hamilton's company would provide mowing and trimming from "April 1 thru Nov. 1." It also stated the company would "[p]rune in late spring and early fall" and provide weed control services.

The second page of the document included several additional provisions and clarifications. In a section titled "Dissolution," the document stated that if the contract was terminated, the parties agreed that Hamilton would be paid based on a sliding scale. If the contract were terminated in November—after all the mowing services had been completed—the document stated that the Housing Authority would pay Hamilton 100% of the amount due under the contract.

The third page of the document included a section entitled "Payment." Under this section, the document provided three payment schedules—one for lawn care and one for other optional work listed there:

> "Payment: (please check desired options)
> o   A. $33,120.00 total for above mentioned services paid at $2,760.00 for 12 months. (Starting April 1st.)
> o   B. _____ billed at $40.00 per man hour.
> o   C. _____ billed at $40.00 per man hour."

Estabrook signed this document on March 16, 2022. He did not check any of the "options" listed under "Payment." But directly above his signature, the document stated: "I hereby accept this general lawncare management plan as defined in this contract. Upon

4

acceptance I confirm that I have read and reviewed the terms and conditions and that I am in agreeance with the contract."

*Performance and Termination*

In accordance with the parties' agreement, Hamilton provided mowing services from April 1 through November 1, 2022. The Housing Authority paid Hamilton's company $2,760 per month from April through October. But in early November, the relationship between the parties eroded.

On November 2, 2022, Hamilton was doing some clean-up work on one of the properties. Estabrook confronted Hamilton and asked why he was continuing to mow after the end of the contract term. Hamilton stated that he knew the contract was complete, but he was "'making one last touch up'" to ensure that the Housing Authority was happy with the job and would consider him again when it was time to bid for the next year's contract. Estabrook informed Hamilton that he should not complete any other lawn work; Hamilton finished the touch-up work and left. He performed no other lawn-care services for the Housing Authority.

The Housing Authority did not make any payments to Hamilton from November forward. In December 2022, Hamilton informed the Housing Authority that he believed the parties were still in an active contract and demanded payment for the off-season months. At the beginning of January 2023, Estabrook sent a letter to Hamilton informing him that the Housing Authority believed the contract ended on November 1, 2022. Estabrook also obliquely referenced the termination clause, stating the contract included a provision that the Housing Authority could "exercise to protect the tax dollars and federal funds utilized to pay for Lawn Service at the Manhattan Housing Authority." Estabrook later testified that the Housing Authority sent this letter to invoke the termination-for-convenience provision.

*The Lawsuit*

When the parties came to a stalemate, Hamilton filed this lawsuit for breach of contract. His petition alleged that the Housing Authority had agreed to pay $33,120 for the lawn services in 12 payments made over the course of a year but had not made the required payments from November forward.

The case proceeded to a bench trial in front of the district magistrate court. Hamilton testified about the terms of the contract and his mowing services. He indicated that instead of charging a higher amount per month for the mowing work, he spread the contract price out over 12 months so he would have an income during the winter months.

Estabrook testified that he did not recall seeing the second page of the March 16 document before the trial. He did remember seeing the first page (defining the timeline of services, from April 1 through November 1) and the third page with the payment information and signature line. Estabrook acknowledged that the Payment section included an option of payment of "$33,120.00 total for above mentioned services paid at $2,760.00 for 12 months," but he noted that he did not check that option (or any option) for payment. He stated that the document may have included that payment plan and amount, but in signing the document, "that is not what [he] was agreeing to."

Instead, Estabrook stated that the Housing Authority was only agreeing to pay $2,760 per month during the time the mowing services were offered. He explained that the Housing Authority had internally budgeted $18,000 for mowing services, meaning it only ever intended to pay the monthly charges from April through October. He also stated that he had the authority to terminate the contract for convenience at any time, which is what he did after all the mowing services were completed.

After hearing the evidence, the court ruled in favor of the Housing Authority, concluding the termination-for-convenience clause in the contract excused it from paying Hamilton anything further. In reaching that decision, the court made several findings of fact:

- The March 14 contract did not include a contract price, but rather contemplated incorporation of "price quotes" from the contractor (Hamilton).

- Neither party presented any evidence about the bids that had been submitted before March 14, but the March 16 document provided by Hamilton contained "price quotes" (the $33,120, spaced over 12 months).

- The parties had agreed that Hamilton's mowing services would be performed between April 1 and November 1, 2022.

- The March 16 document was not "a separate contract that would override or trump the terms of the March 14th contract," which included the mandatory termination-for-convenience provision.

- The Housing Authority terminated the contract for convenience, and nothing else was due to Hamilton or his company after the contract had ended.

Hamilton appeals, claiming the court erred when it found that he could not recover the remaining $13,800 ($2,760 per month for five months) he believes to be due under the contract.

DEFICIENCIES IN APPELLANT'S BRIEF

Before we consider the merits of the parties' arguments concerning their contract, we address the Housing Authority's procedural arguments regarding various deficiencies in Hamilton's appellate brief. We agree that the brief submitted does not meet many of the requirements relating to appellate briefing in Kansas. See Kansas Supreme Court Rule 6.02(a)(2)-(5) (2024 Kan. S. Ct. R. at 36). But these requirements exist to help the parties and the court understand the facts and resolve the issues presented. We are able to do that here. And the Housing Authority was able to do so. Our briefing rules are not jurisdictional requirements that affect our authority to hear an appeal, but rather procedural requirements that can be waived by parties or excused by courts in the appropriate circumstances. See *Szoboszlay v. Glessner*, 233 Kan. 475, 481, 664 P.2d 1327 (1983). We exercise our prudential power to accept Hamilton's brief and proceed to the merits of his claim.

BREACH OF CONTRACT

A contract is a promise between parties to be bound by certain agreed-upon terms. This agreement can be shown in various ways; for example, it can be memorialized in writing (such as through the parties' signatures) or it can be implied from the parties' conduct. See *Lindsey Masonry Co. v. Murray & Sons Construction Co.*, 53 Kan. App. 2d 505, 526, 390 P.3d 56 (2017).

The existence of a contract and the nature of its intended terms are normally questions of fact. A party asserting the existence of a contract bears the burden of proving its terms by a preponderance of the evidence. See *U.S.D. No. 446 v. Sandoval*, 295 Kan. 278, 282, 286 P.3d 542 (2012). Appellate courts defer to factual findings made by the trial court if they are supported by substantial competent evidence. See *Wiles v. American Family Life Assurance Co*., 302 Kan. 66, 73, 350 P.3d 1071 (2015). But when the legally

relevant facts in a case are undisputed, the existence and terms of a contract are questions of law subject to de novo review. *Sandoval*, 295 Kan. at 282. And appellate courts exercise unlimited review over the interpretation and legal effect of written language, including written contracts. See *Prairie Land Elec. Co-op v. Kansas Elec. Power Co-op*, 299 Kan. 360, 366, 323 P.3d 1270 (2014).

Our primary goal in contract cases is to give effect to the parties' intent. *Russell v. Treanor Investments*, 311 Kan. 675, 680, 466 P.3d 481 (2020). When the parties have memorialized their agreement in a written contract, as the Housing Authority and Hamilton did here, and the written terms of the contract are clear, we determine that intent "from the language of the contract without applying rules of construction." *Anderson v. Dillard's, Inc.*, 283 Kan. 432, 436, 153 P.3d 550 (2007). We limit our consideration to the contract language itself and do not consider other evidence—such as the parties' testimony—regarding what they may or may not have intended the contract to cover. *Simon v. National Farmers Organization, Inc.*, 250 Kan. 676, 679-80, 829 P.2d 884 (1992); *Arensman v. Kitch*, 160 Kan. 783, 789, 165 P.2d 441 (1946).

With these principles in mind, we turn to the language of the written contract between the Housing Authority and Hamilton.

The trial court found that this contract did not include the amount that Hamilton would be paid for his mowing services. Instead, the contract stated that the Housing Authority would pay Hamilton "in accordance with the contractor[']s price quotes" and the HUD Conditions. The court also found that the parties had not provided any evidence of the bid submitted by Hamilton before that contract was signed. But the March 16 document submitted by Hamilton and signed by Estabrook did contain a price quote— "33,120.00 total for [the] above mentioned services paid at $2,760.00 for 12 months." These findings are supported by substantial competent evidence in the record and are consistent with the language of the contract.

9

At trial, the Housing Authority argued that the $33,120 listed in Hamilton's price quote was not actually the amount due for the lawn-care services. Estabrook pointed out that he did not check the box next to that amount on the March 16 document when he signed it. Instead, Estabrook testified that the Housing Authority only intended to pay the monthly amount of $2,760 until November 1 and internally budgeted only about $18,000 for lawn-care services. But the trial court did not make any findings regarding this testimony; instead, it found that the March 16 document contained the price quote referenced in the contract. The Housing Authority does not contest this ruling on appeal.

Thus, there was substantial competent evidence presented at trial to support the trial court's finding that the Housing Authority agreed to pay Hamilton "in accordance with the contractor[']s price quotes," and Hamilton's price quote was included in the March 16 document. The only price included in that document for the cost of the mowing services was $33,120, paid over 12 months at $2,760 per month.

The trial court then concluded that despite this contract price, the Housing Authority had no obligation to pay Hamilton from November to March due to the termination-for-convenience clause. This conclusion cannot be reconciled with the trial court's factual findings or the undisputed facts discussed at the trial.

As we have noted, the parties' contract incorporated certain general language applicable to all HUD contracts that the Housing Authority "may terminate this contract . . . for [its] convenience." The trial court concluded—and the Housing Authority argues on appeal—that this language excused the Housing Authority from any payment to Hamilton beyond November 2, when Estabrook notified Hamilton the contract was canceled. The Housing Authority has focused its arguments, both at trial and on appeal, on *when* this clause was triggered—on November 2, when Estabrook told Hamilton to stop performing lawn services, or on January 3, when Estabrook reiterated this position in

writing. The trial court apparently concluded that this nuance was unimportant, a conclusion Hamilton does not appear to challenge on appeal.

But the trial court's ruling failed to consider the *actual language* of the termination-for-convenience clause, and the Housing Authority similarly does not discuss that language in any detail. That clause states: "If the termination is for the convenience of the [Housing Authority], [it] shall be liable only for payment for services rendered before the effective date of the termination."

The court found that the parties had contracted for Hamilton to perform "mowing," and this work was to "occur[] from April 1st through November 1st." No one argued that Hamilton had not performed this work during the intended timeframe or claimed that he had any work that was yet to be completed. In other words, all of Hamilton's lawn-care services were "rendered before the effective date of the termination." Thus, the plain language of the termination-for-convenience clause did not eliminate the Housing Authority's obligation to pay Hamilton for the services he had already performed. The trial court erred when it concluded that the Housing Authority had not breached the contract when it failed to make the remaining payments for those services.

CONCLUSION

The language of the parties' written contract indicated that Hamilton would provide lawn-care services at the Housing Authority's properties between April 1 and November 1, 2022, and the cost of these services would be $33,120, to be paid in 12 monthly installments of $2,760. Hamilton provided these services and is contractually entitled to be paid for his work. While the Housing Authority could (and did) terminate the contract for its convenience after these services were completed, it was still required to pay Hamilton for the work he had already done.

11

We reverse the district court's judgment in favor of the Housing Authority and remand with directions to enter judgment in favor of Hamilton for $13,800 (the amount remaining under the contract).

Reversed and remanded with directions.