No. 114,812

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

LINDSEY MASONRY CO.,
*Appellee*,

v.

MURRAY & SONS CONSTRUCTION CO. and THE OHIO CASUALTY INSURANCE CO.,
*Appellants*.

SYLLABUS BY THE COURT

1.

To form a binding contract, there must be a meeting of the minds on all essential elements. Contract formation requires an unconditional and positive acceptance. A conditional acceptance is really a counteroffer and no contract is formed.

2.

An acceptance of a contract must mirror the terms of the offer. A conditional acceptance is a counteroffer that rejects the original offer.

3.

When one party has knowledge of a term required by another party and continues to do business with that party without objection, the facts may establish that the party impliedly agreed to the term.

4.

Under the Kansas Fairness in Public Construction Contract Act, found at K.S.A. 16-1901 *et seq*., the term "contract" means a contract or agreement concerning

1

construction made and entered into by and between an owner and a contractor, a contractor and a subcontractor, or a subcontractor and another subcontractor.

5.

An implied-in-fact contract has the same legal effect as an express contract. Parties may be bound as firmly by implied contracts as by those expressed in words, oral or written. The law implies, from circumstances and the silent language of the parties' conduct and actions, contracts and promises as forcible and binding as those made by express words or through the medium of written memorials.

6.

Prejudgment interest can be awarded to both express and implied contracts.

7.

The Kansas Fairness in Public Construction Contract Act requires a contractor pay its subcontractors on any properly completed and undisputed request for payment within 7 business days of receipt of payment by the owner. K.S.A. 16-1903(f). If the contractor fails to pay its subcontractors within such timeframe, the contractor shall pay 18 percent interest on the undisputed amount. K.S.A. 16-1903(g).

8.

When a court resolves a case based on quantum meruit, it finds that no contract existed. In such a case, the law creates a contract to prevent unjust enrichment. In contrast, an implied-in-fact contract has the same legal effect as an express contract.

9.

It is fundamental that equitable remedies are generally not available if there is an adequate remedy at law.

Appeal from Johnson District Court; GERALD T. ELLIOTT, judge. Opinion filed February 3, 2017. Affirmed.

*Michael L. Entz*, of Entz & Entz, P.A., of Topeka, for appellants.

*Jeffrey M. Hensley* and *Theodore C. Beckett III*, of Beckett & Hensley, L.C., of Kansas City, Missouri, for appellee.

Before MALONE, C.J., HILL and ATCHESON, JJ.

HILL, J.: This is an appeal by Murray & Sons Construction Company of the trial court's holding that it had breached an implied-in-fact contract with Lindsey Masonry Company by not paying for all of the services performed. Along with the contract payments, the trial court awarded interest, costs, and attorney fees as authorized by the Kansas Fairness in Public Construction Contracts Act. Our review of the extensive record leads us to conclude that we must affirm the judgments of the trial court.

*With no signed contracts, a general contractor and a masonry company work together on several public school projects.*

The Blue Valley School District decided to build four buildings: the Blue Valley Elementary School #22, the New Highlands Elementary School, Blue Valley Southwest High School Sports Field Buildout, and Blue Valley Middle School #10. Over a span of several months, the school district sought and received separate bids on each project. Murray & Sons bid on the projects as the general contractor and asked Lindsey Masonry to submit bids on the projects for the masonry work (labor only).

Blue Valley picked Murray as the general contractor on each of these projects and Lindsey became Murray's masonry subcontractor for all four buildings. A pattern of business then developed between the two companies as the work progressed. For each

3

building project, Lindsey submitted to Murray a written proposal that included the names of the parties, the identification of the project, the price, the scope of work, exclusions from the scope of work, and the identification of the plans, specifications, and drawings that applied to each.

Each of Lindsey's proposals indicated that the parties would later sign an AIA Document A-401 Standard Form Agreement between Contractor and Sub-Contractor. (This form is supplied by The American Institute of Architects.) The proposals also contained language regarding the timing of payments and listed the percentage of retainage to be withheld.

After that, Murray would include the price from each of Lindsey's proposals in its bids to Blue Valley.

After Murray was awarded the contract on each project, it asked Lindsey to be the masonry subcontractor. Lindsey then sent Murray a schedule of values for each project. The schedule of values, essentially, is a price list that sets out each masonry task to be performed. Lindsey used the schedule of values when it prepared its pay applications to Murray and, in turn, Murray used the same schedule of values when it prepared its pay applications to Blue Valley.

After each successful bid on each project, Lindsey signed and sent an AIA form subcontract to Murray to sign. In return, Murray sent a signed AGC subcontract form to Lindsey for its signature. (This is a contract form supplied by the Associated General Contractors of Kansas, Inc.) Neither party signed the form contracts sent by the other company. As far as we can tell from this record, no written agreements were ever signed by both parties, except for some specific change orders signed in the midst of construction.

4

Nevertheless, Murray authorized Lindsey to begin work on each project and Lindsey did so. Lindsey periodically submitted pay applications to Murray and received periodic payments from Murray. As the buildings progressed, Murray submitted pay applications to the owner and received payments from Blue Valley. After payment, Lindsey would return partial lien waivers that reflected the amount of the payment.

Unfortunately, the working relationship between Murray and Lindsey deteriorated, and Lindsey walked off the Blue Valley #10 job before completing the masonry work. Later, Lindsey filed a lawsuit seeking money from Murray. In its lawsuit, Lindsey claimed damages for money due on each of the projects, asserting alternative theories of recovery based on breach of contract, promissory estoppel, and quantum meruit. Murray denied liability and asserted counterclaims against Lindsey on each project.

*The parties submitted the case to the judge.*

At trial, both Lindsey and Murray agreed about the identity of the parties, the scope of work, and the original price, as modified by the fully executed change orders for each project. They did not agree on anything else.

In the end, the trial court found that the evidence failed to establish an express contract between the two companies. Instead, the court concluded that there was an implied-in-fact contract on each project for Lindsey to perform the masonry work described in the scope of work in exchange for the compensation set out in Lindsey's proposal and schedule of values. The implied-in-fact contract contained no specific time for payment. The court made specific findings about each project. We list a brief summary of each.

**Blue Valley #22**

On the Blue Valley #22 project, the district court found that the parties agreed to a revised total compensation of $1,036,848 for the masonry work. Lindsey completed all of its work on the project, but received only $1,020,568 from Murray. The court found Murray in breach of contract for its failure to pay Lindsey the remaining balance of $15,916 and granted judgment in that amount.

The court denied Murray's counterclaim for $5,511 for the cost to repair a damaged portion of a roof. The court found that the parties' conduct established an agreement that any changes in the work would be made by written change orders signed by both parties. Since Murray had submitted a change order for the roof repair and Lindsey had not signed it, Lindsey was not liable under the counterclaim. The district court awarded Lindsey interest, costs, and attorney fees under the Kansas Fairness in Public Construction Contract Act found at K.S.A. 16-1901 *et seq*. (not to be confused with the Kansas Fairness in Private Construction Contract Act found at K.S.A. 16-1801 *et seq*.)

**New Highlands**

On the New Highlands project, the district court found that the parties agreed to a revised total compensation of $1,014,358. Lindsey completed its work, but $83,794 remained unpaid. The district court found Murray in breach of contract for failure to pay that amount.

The district court found Lindsey in breach of contract for not installing some steel rebar in the storm shelter walls on that project. Murray was entitled to recover $55,250 from Lindsey to remediate the rebar omission. In addition, Murray was entitled to recover $5,957 in damages to remediate some subsequent damage to the water proofing and a protection board.

6

The court set off Murray's damages against Lindsey's damages, resulting in a net judgment of $22,587 awarded to Lindsey. In addition, the court awarded Lindsey interest, costs, and attorney fees under the Act.

**Sports Field Buildout**

On the Sports Field Buildout project, the district court found that the parties agreed to a price of $123,590. The court found that $12,565 remained due to Lindsey and awarded judgment in that amount plus interest, costs, and attorney fees under the Act. The court denied Murray's counterclaim for $4,166 in damages for weather-related time extensions.

**Blue Valley #10**

While this project was in progress, the parties' relationship ruptured. On the Blue Valley #10 project, the district court found that the parties agreed to a revised price of $1,727,922. On October 27, 2010, Lindsey stopped work on the project and walked off the job when the masonry work was 65 percent complete.

The court found that Lindsey stopped work because Murray repeatedly stated to Lindsey that it was not going to pay Lindsey. The court also found that Murray's act of shutting off the water and removing the water meter meant that Lindsey could no longer mix mortar to do the masonry work.

On this project, Murray did not pay Lindsey on its pay applications for work done in August, September, and October 2010. Those applications total $490,188.72. The court found that Lindsey was not responsible for damages that Murray incurred when Lindsey walked off the job because the expenses were actually due to Murray's breach. Murray was, however, entitled to $55,998 for indemnification of expenses incurred when the project was shut down temporarily due to an accident involving a Lindsey employee. The district court set off the $55,998 against the $490,118.72 for a net judgment of

7

$424,190.72 awarded to Lindsey. The district court also awarded Lindsey interest, costs, and attorney fees under the Act.

Murray raises five issues in this appeal. The general contractor contends:

**First,** by beginning work, Lindsey accepted Murray's AGC form contract. It refers to this as acceptance by performance.

**Second,** the court erred by refusing evidence that the two companies agreed to many things on the Blue Valley #10 project.

**Third,** the Kansas Fairness in Public Construction Contracts Act is inapplicable to implied-in-fact contracts.

**Fourth,** the court erred by not considering alternative equitable theories of recovery.

**Fifth,** the court's findings are not supported by substantial competent evidence and should be set aside.

We will address the issues in that order.

*Is Lindsey bound by the AGC contract instead of an implied-in-fact contract as the court found?*

The district court found that the evidence simply failed to establish an express contract consisting of either the terms of Lindsey's AIA form or Murray's AGC form on any of the four projects because there was no evidence that the parties expressed their mutual assent orally or in writing to the terms by which Lindsey would work. The district court found that the sequence on one or more of the projects of Murray sending its proposed AGC contract to Lindsey, Murray telling Lindsey to begin work, and then Lindsey beginning work, did not establish mutual assent to the terms of the AGC contract. Murray argues the court's interpretation of the facts is wrong.

8

Murray contends that the district court failed to properly apply Kansas contract law and asks us to remand the case. In Murray's view, an express contract was formed because Lindsey accepted the terms of Murray's AGC contract by commencing performance and submitting required preconstruction documents such as a schedule of values and proof of insurance in compliance with the terms of the AGC contract.

A review of some fundamental points of contract law is helpful at this stage. Whether a contract has been formed depends on the intent of the parties and is a question of fact. *U.S.D. No. 446 v. Sandoval*, 295 Kan. 278, 282, 286 P.3d 542 (2012). To form a binding contract, there must be a meeting of the minds on all essential elements. Contract formation requires an unconditional and positive acceptance. A conditional acceptance is really a counteroffer and no contract is formed. *Sandoval*, 295 Kan. at 282.

We acknowledge that parties may be bound by the terms of a contract, "even though they do not sign it, where their assent is otherwise indicated, such as by accepting and acting upon the contract, or by ratifying the contract, or by the acceptance by one of the performance by the other." 17A Am. Jur. 2d, Contracts § 172, p. 184.

Murray relies primarily on the holding in *Gunnison v. Evans*, 136 Kan. 791, 794, 18 P.2d 191 (1933), to support its position. The *Gunnison* court held that an offer of a unilateral contract, in which the offeror makes a promise, may be accepted by compliance with the request in the offer. The ruling relies upon Restatement (First) of Contracts § 56, comment a. We note that the Restatement also provides:  "An offer can be accepted by the rendering of a performance only if the offer invites such an acceptance." Restatement (Second) of Contracts § 53 (1981; online 2016).

The facts in *Gunnison* reveal a much simpler set of expectations of the parties than what is present in this case. Lee Gunnison promised, in a writing dated October 9, 1928, that Fred Evans and family could occupy Gunnison's home as long as they wished.

9

Gunnison reserved a room for his own use and he would have board and meals for no charge. Evans was to pay the gas, light, and water. In September 1929, Gunnison notified Evans to leave within 30 days. The district court found that the Evans family had, from the time they moved in,

> "'furnished [Gunnison] with free board and meals, free lodging, free gas, light and water at all times that the same were desired, requested or accepted by the plaintiff, and the defendants stand ready, able and willing at the present time to accord the plaintiff all of the privileges reserved by him in said writing . . .'" 136 Kan. at 793.

The Supreme Court held that the writing contained an offer in the form of a promise by Gunnison that the Evans family could use and occupy his home as long as they desired, on stated terms. The writing did not ask for a return promise by Evans such as "[w]e promise to allow you to use your own room, promise to furnish you meals without charge, and promise to pay gas, light and water bills." 136 Kan. at 794. Rather, the writing/offer called for forbearance with respect to the room and performance of specified tasks. The court held that the Evans family accepted the offer by "actual performance of the conditions embodied in" the offer. 136 Kan. at 794.

Though *Gunnison* sets out the basic rule that acceptance may be accomplished by performance, it is distinguishable from this case for two reasons. First, the AGC subcontract was not offered as a unilateral contract. Murray's transmittal letter specifically requested a return promise—that Lindsey sign and return a copy of the contract. Lindsey did not comply with the request of the offer. Second, Lindsey did not perform the terms of the AGC subcontract and was not ready and willing to.

There is a difference between the few discrete acts that Gunnison asked Evans to perform—allow Gunnison to use his room, furnish meals, pay the gas, light, and water

10

bills—and the lengthy AGC subcontract. There is simply not sufficient evidence in the record to establish an acceptance by performance as stated in *Gunnison*.

Continuing along this line, Murray contends that Lindsey's submittal of the required preconstruction documents, such as a schedule of values and proof of insurance, is sufficient evidence of acceptance by performance. But there was no evidence that Lindsey was assenting to the AGC subcontract when it submitted those documents.

Jon Lindsey testified that he submitted his insurance certificate and W-9 after the owner awarded Murray the general contract. Jon Lindsey also testified that he prepared a schedule of values upon a request by Gene Murray. Gene would call and tell him how to break it down. The several schedules of values that Lindsey submitted were all on AIA forms.

We cannot ignore the fact that the evidence shows that Lindsey sent a signed AIA subcontract to Murray after or on the same date that Murray sent the AGC subcontract. This action indicates that Lindsey rejected the AGC subcontract and submitted a counteroffer. The testimony was unclear about when the subcontracts were exchanged. The evidence on each project shows:

**Blue Valley #22:**
- AGC subcontract—letter of transmittal dated October 8, 2007;
- AIA subcontract—letter of transmittal dated November 5, 2007; and
- Lindsey began work after March 1, 2008.

**New Highlands:**
- AGC subcontract—letter of transmittal dated March 17, 2008, handwritten notes indicate that it was delivered to a preconstruction meeting on March 26, 2008;

11

- AIA subcontract—letter of transmittal dated March 6, 2009, notes that it had been hand delivered on March 26, 2008, but was lost, and mailed per a request "from Leslie" on December 4, 2008; and

- Lindsey began work after November 20, 2008.

**Sports Field Buildout:**

- AGC subcontract—letter of transmittal dated November 24, 2009, notes that second set was sent on March 22, 2010;

- AIA subcontract—letter of transmittal dated December 2, 2009; mailed March 22, 2010;

- Lindsey began work after January 3, 2010; and

- AIA revisions—letter of transmittal dated September 23, 2010, notes that two copies were taken to be hand delivered on October 7, 2010.

The principals of each company did not agree on much at trial. Jon Lindsey testified that Gene Murray called him on bid days and accepted his proposals. Gene testified that he did not accept Lindsey's proposals on bid days and would not have formed a contract with Lindsey until he was awarded the general contract, which was weeks later. Jon testified that he sent letters confirming the contract the day after bid days. Gene denied that he received the letters and noted that the letters did not contain Murray's "received on" stamp.

What is clear is that neither the AIA nor the AGC subcontract were signed by both parties. The parties could not agree on an expression of acceptance. Thus, the evidence supported the district court's finding that no express contract was formed. Lindsey was not bound by the terms of Murray's AGC form contract.

*We look at one instance when Murray signed an AIA form.*

During the Blue Valley #10 project, extreme weather conditions, including saturating rains, cold weather, and snow, caused problems. Delays resulted from problems accessing the job site, a lack of materials, a lack of communication, certain trades falling behind, and Murray's failure to provide the owner a schedule for the project. The owner wanted to get the construction done so the building could open for school at a certain time. Murray and the school district became concerned about the progress of the masonry work and the sufficiency of the masonry manpower. The school district notified Murray that the masonry manpower needed to be supplemented to bring the project back on schedule.

In a letter to Lindsey dated July 26, 2010, Murray stated: "Notwithstanding the fact that a written agreement has not been executed, a contract exists between Murray & Sons Construction Company, Inc. (Murray) and Lindsey Masonry Company as evidenced by the fact that Lindsey Masonry Company has undertaken performance and has been paid for its work." The letter stated that Lindsey was in default and needed to fully man the project within 7 days to cure the default or Murray would hire a replacement subcontractor.

Murray modified the AIA subcontract form, signed it, and sent a copy to Lindsey with a transmittal letter dated September 23, 2010. The letter asked Lindsey to review it, initial the changes made, and return it. Lindsey did not respond to the modified AIA form.

Gene Murray testified that he modified the AIA form and signed it because he knew he and Lindsey were headed for litigation if things did not straighten up on the project. A few days later, Murray sent Lindsay another letter stating that Murray was very

13

concerned about the progress of the project and included a letter from the owner regarding its concerns.

Still concerned about the number of workers, Murray sent Lindsay a letter referring to certain paragraphs of the AIA subcontract:

- paragraph 2.1 subcontractor assumes all obligations and responsibilities that general contractor assumes to the owner;
- paragraph 4.1.1 subcontractor is required to cooperate with general contractor in scheduling and performing the work to avoid delay;
- paragraph 3.3.1 subcontractor will be held responsible for liquidated damages for delays caused by the subcontractor; and
- paragraph 3.4.1 subcontractor must correct deficiencies within 3 working days or contractor will correct the deficiency and deduct the reasonable cost from payments due to the subcontractor.

The letter stated that Lindsey did not have a sufficient number of workers on the project and must increase its labor force within 3 days. Three days later, Murray sent notice that Lindsey failed to correct the deficiencies and Murray would proceed with hiring additional labor and deduct the reasonable costs from payments due to Lindsey.

Matters quickly went downhill from there. Gene Murray told Jon Lindsey that he was not going to pay Lindsey. Lindsey's attorney sent Murray a letter giving Murray 7 days' written notice under section 4.7.1 of the AIA subcontract that Lindsey would stop work on the project if it did not receive payment on its payment application #8. The letter stated that the payment was due on September 25, 2010, and was "seriously delinquent."

Pay application #8 was dated August 27, 2010. Lindsey's counsel sent another letter requesting payment for "past due" amounts or Lindsey would stop work the next

14

day under section 4.7.1 of the subcontract until payment was received. That letter also stated that retainage amounts for payment applications #1 through #7 were past due.

Murray again told Lindsey that he was not going to pay and did not have the money. Jon Lindsey testified that after his conversations with Gene Murray on October 26, Murray turned off the water supply that Lindsey used to mix mortar and removed the water meter from the hydrant so Lindsey could not work. Jon felt they were trying to force him off the job. As of October 27, Lindsey stopped work on the project and started to demobilize because of Murray's failure to pay and turning off the water.

Although both parties referred to certain subsections of the AIA form during their dispute, there was never an expression of acceptance to a single version of the contract. Even though Murray signed an AIA form contract on this one project it was signed only after Murray made significant alterations to the agreement; thus, making it actually a counteroffer that Lindsey refused. From this record we must agree with the district court—there was no express contract between the parties here.

*Did the court erroneously exclude evidence of an agreement?*

This brings us to Murray's next issue. Murray contends that the district court improperly excluded evidence of mutually agreeable contract terms in the form contracts exchanged between the parties. Basically, Murray argues that Lindsey agreed to numerous provisions in the AGC contract because those same provisions were contained in Lindsey's AIA contract and Lindsey's conduct was consistent with those duties.

Actually, the testimony that Murray refers to on appeal had nothing to do with the AGC contract. Rather, Murray's counsel was attempting to establish that a contract existed between the parties consisting of certain unmodified terms within the modified version of the AIA subcontract that Murry sent to Lindsey on September 23, 2010.

15

The district court sustained Lindsey's objection because counsel was attempting to establish agreement to certain paragraphs within the modified version of the AIA subcontract when there was no evidence that Lindsey had accepted the modified version of the AIA subcontract. At a posttrial motion hearing, the district court explained that "each party rejected the subcontract of the other" and any "respective discre[te] similarities" between the subcontract agreements had "to be seen in the context of the larger document that was rejected."

In our view, the district court's ruling is consistent with the general rule that an acceptance of a contract must mirror the terms of the offer. 17A Am. Jur. 2d, Contracts § 80. A conditional acceptance is a counteroffer that rejects the original offer. *Sandoval*, 295 Kan. at 282. Lindsey and Murray did not have an agreement by virtue of Murray sending Lindsey a modified AIA contract. Instead it was another offer. Thus, there was no contract unless Lindsey accepted Murray's offer (the modified version of the AIA) in its entirety. And, when the district court ruled, there was no evidence that Lindsey expressed acceptance to the modified AIA contract document.

But that does not necessarily resolve the issue of whether certain provisions in the contract documents exchanged by the parties were relevant to establishing the parties' course of conduct for an implied-in-fact contract. Implied-in-fact contracts arise in Kansas most frequently in the employment context. Kansas courts consider certain factors to determine the understanding and intent of the parties when an employment contract is implied in fact:

> "written or oral negotiations, the conduct of the parties from the commencement of the employment relationship, the usages of the business, the situation and objective of the parties giving rise to the relationship, the nature of the employment, and any other circumstances surrounding the employment relationship which would tend to explain or make clear the intention of the parties." *Allegri v. Providence-St. Margaret Health Center*, 9 Kan. App. 2d 659, Syl. ¶ 5, 684 P.2d 1031 (1984).

16

Intent is a question of fact. *Allegri*, 9 Kan. App. 2d at 663.

When one party has knowledge of a term required by another party and continues to do business with that party without objection, the facts may establish that the party impliedly agreed to the term. See *Atchison County Farmers Union Co-op Ass'n v. Turnbull*, 241 Kan. 357, 363-64, 736 P.2d 917 (1987).

We now focus on the excluded evidence. Murray's attorney was cross-examining Jon Lindsey:

"Q.      . . . Do you recall receiving a modified AIA document from Murray and Sons at some point during the course of construction on the Blue Valley 10 project?

"A.      I believe I received one from Gene Murray.

. . . .

"Q.      Okay. Now as to the provisions that have not been modified, would you agree that at least at this point in time, there was an agreement or a mutual agreement as to certain unmodified terms contained in the AIA document?

"MR. BECKETT:  I'm going to object. That's an unfair question. This is not an agreement of the parties. In fact, there's a back story of this I'll reveal as we go forward on this document and how—I would object to this line of questioning.

"THE COURT:  I'm not going to sustain the objection to the line of questioning but I will sustain the objection to that particular question.

. . . .

"Q.      Let's look at paragraph 11.3.

"A.      Yes.

"Q.      That's a provision we looked at earlier. Does that appear to be in the same form as it was when you sent it to Murray?

"A.      It appears to be.

"Q.      So it appears that this version that Murray sent to you is consistent with the version you sent to them with respect to at least 11.3?

"A.      As compared to 11.3.

"Q.      Let's look at paragraph . . . 3.4.1.

17

"MR. BECKETT: I'm going to object to the questioning of this witness as it relates to a document that the parties didn't enter into. And he has—the questioning of this witness has elicited testimony from this witness that neither parties executed the same agreement. Now questions about what might be contained in this document, I don't see how that's relevant to the inquiry before the Court. I don't know where this is going but asking this witness to talk about a document that he never entered into and selecting specific provisions out of that, I would object. I think it's totally inappropriate.

. . . .

"MR. ENTZ: We're attempting to establish mutually agreeable terms between the part[ies]. Obviously, it's not the ideal situation when we have a document signed by both. But we have a course of conduct that was established by the practices involved and also at this point in time we're now exchanging at least certain terms that tend to mesh up, both parties are recognizing. That's the point we're trying to establish that certain provisions in here Lindsey Masonry sent to Murray and Sons and at some point in time, Murray and Sons recognized the provisions and sent them back to [Lindsey]. No, we're not going to have a fully-executed contract at any point in time in discussing these projects but we will have mutually agreeable terms that are a basis for implied contracts between the parties.

"MR. BECKETT: . . . But the parties never entered into any agreement relative to AIA 401 or relative to an ABC contract. That's been established clearly in this case. I think admitted by both parties. So to go through an AIA document, that wasn't entered into by the parties and try to piecemeal provisions and say they somehow apply to the analysis before the Court, I think, is improper.

. . . .

"THE COURT: If I have an accurate grasp of the facts, the original proposal for this particular project provided that the parties contemplated—what was the language—expected to enter into a 401.

. . . .

"THE COURT: Mr. Lindsey forwarded a 401 that he signed to Mr. Murray. And it appears as though Mr. Murray made some changes in that and sent it back—and signed it—and sent it back to Mr. Lindsey and asked Mr. Lindsey to initial and accept the changes. That's what it looks like.

"Now, in an effort to establish some terms that the defendants contend the parties agreed to in some way, Mr. Entz is taking a contract that—a form of the 401—that Mr.

18

Lindsey, at least there hasn't been in evidence, that Mr. Lindsey agreed to. And if I understand what's happening, Mr. Entz is attempting to ask Mr. Lindsey if Mr. Lindsey is agreeable to particular paragraphs, most recently 3.1 in an effort to try to establish an agreed . . . financial arrangement between the parties. Now that's what it looks like to me.

"I don't think that that's the proper way . . . to do it under the circumstances of this case. So I'm going to sustain your objection, Mr. Beckett.

. . . .

"Q.     (By MR. ENTZ) When you received the AIA subcontract from Murray, . . . Did you agree to or still agree to some of the provisions that you ha[d] previously proposed to Murray and Sons?

"MR. BECKETT:  Your honor. Object.

"THE COURT:  Sustain the objection for the same reasons previously expressed."

After trial, the court clarified its ruling:  "[E]ach party rejected the subcontract of the other" and any "respective discre[te] similarities" between the subcontract agreements had "to be seen in the context of the larger document that was rejected."

The district court did not exclude evidence about the parties' conduct. An elaborate walk-through of each provision in the modified AIA subcontract would not have been useful because the document was already in evidence. But Murray's contention that the district court should have considered the contract forms exchanged between the parties when determining the terms of the implied-in-fact contract is not wholly unpersuasive. Lindsey surely intended to be governed by the terms of the AIA when Lindsey sent the AIA contract to Murray. On the other hand, there was little evidence that the parties ever, at the same time, intended to be governed by the terms of either contract.

After considering the clarification made by the court, we agree with its ruling and find no error in sustaining the objection.

19

*The Kansas Fairness in Public Construction Contract Act applied to this contract.*

The Act is found at K.S.A. 16-1901 *et seq*. It states that the term "'Contract' means a contract or agreement concerning construction made and entered into by and between an owner and a contractor, a contractor and a subcontractor or a subcontractor and another subcontractor." K.S.A. 16-1902(b). The Act does not distinguish between express contracts and implied-in-fact contracts.

Indeed, general law of contract principles dictate that an implied-in-fact contract has the same legal effect as an express contract:

> "Parties may be bound as firmly by implied contracts as by those expressed in words, oral or written. The law implies, from circumstances and the silent language of men's conduct and actions, contracts and promises as forcible and binding as those made by express words or through the medium of written memorials." *In re Estate of Langdon*, 165 Kan. 267, 274, 195 P.2d 317 (1948).

In other contexts, our Supreme Court has recognized that prejudgment interest applies to both express and implied contracts. *Arrowhead Const. Co. v. Essex Corp*, 233 Kan. 241, 251, 662 P.2d 1195 (1983), *disapproved on other grounds by Wichita Sheet Metal Supply, Inc. v. Dahlstrom & Ferrell Constr. Co.*, 246 Kan. 557, 792 P.2d 1043 (1990).

The court held that the following facts implied an enforceable contract that arose between Murray and Lindsey.

> "1.     Murray asked Lindsey to submit a bid proposal for the masonry work.
> "2.     Lindsey submitted a bid and Murray received and used Lindsey's bid in Murray's bid for the general contract.

20

"3.     Murray was awarded the general contract.

"4.     Lindsey submitted a schedule of values.

"5.     After Murray directed Lindsey to begin work on each project, Lindsey began, and performed work on each.

"6.     Lindsey submitted to Murray a written subcontract signed by Lindsey, which proposed subcontract terms between the two parties; Murray submitted to Lindsey a written subcontract . . . with the provisions Murray proposed. Neither party signed the subcontract proposed by the other. No written or oral mutual assent to terms pursuant to which Lindsey would perform the masonry work on any of the four projects was ever expressed by the parties.

"7.     Lindsey performed work on each of the projects and submitted pay applications to Murray for the work it performed using the schedule of values.

"8.     Murray utilized Lindsey's pay applications and schedule of values in its pay applications to the owner.

"9.     Murray paid Lindsey pursuant to Lindsey's pay applications, for certain of Lindsey's work, but withholding retainage.

"10.    The owner made payments to Murray pursuant to Murray's pay applications.

"11.    Change orders for the masonry work were agreed to and executed by the parties."

The parties' failure to define payment terms does not change the analysis. The Act does contemplate that payments should be made "pursuant to the terms of the contract," but that is "[s]ubject to the provisions" in the subsections that follow. K.S.A. 16-1903(a). Subsection (f) states that the "contractor shall pay its subcontractors any amounts due within seven business days of receipt of payment from the owner . . . ." K.S.A. 16-1903(f). There are provisions for payment of retainage. K.S.A. 16-1903(f); K.S.A. 16-1904. The Act also states that the "rights and duties prescribed by this act shall not be waivable or varied under the terms of a contract." K.S.A. 16-1901(b). Thus, the Act's payment provisions supersede and fill in the parties' contract gap.

Gene Murray testified that his practice was to pay Lindsey within 7 days of receiving payment from the owner. Murray breached the contract when it did not pay Lindsey on its outstanding payment applications.

21

*Were these payment obligations undisputed as required by the Act?*

The Act requires a contractor pay its subcontractors on any properly completed and "undisputed" request for payment within 7 business days of receipt of payment by the owner. K.S.A. 16-1903(f). If the contractor fails to pay its subcontractors within such timeframe, the contractor shall pay 18 percent interest on the "undisputed" amount. K.S.A. 16-1903(g).

Murray contends that the following payments were disputed:

- Blue Valley #22 Project: $5,511 of the $15,916 sought by Lindsey for damages that Murray sustained to repair a roof that was damaged during the construction.
- New Highlands Project: All of the $83,794 Lindsey claimed. Murray filed a counterclaim for $92,439 in damages for Lindsey's failure to construct the storm shelter walls according to the plans.
- Sports Field Buildout Project: $4,166 of the $12,565 sought by Lindsey for damages Murray sustained as a result of delays in the construction schedule.
- Blue Valley #10 Project: All of the $654,862 claimed by Lindsey. Murray filed a counterclaim for $1,335,073 in damages that Murray sustained when Lindsey walked off the project.

The district court found the entire net judgment "undisputed." At a later hearing, the court explained that there was never a dispute that the work described in the schedule of values was done. Though there were setoffs claimed, the underlying money that Lindsey was owed for doing the work described in his payment applications was not disputed.

22

Under the Act, "'undisputed payment' means payments which all parties to the contract agree are owed to the contractor." K.S.A. 16-1902(i). A panel of this court has held that for a payment to be disputed, there must be some matter that can be disputed in good faith because Kansas contracts contain an implied covenant of good faith and fair dealing. *VHC Van Hoecke Contracting, Inc. v. Murray & Sons Construction Co.*, No. 106,603, 2012 WL 2326027, at *3-4 (Kan. App. 2012) (unpublished opinion). When there is a dispute over whether the project was completed, then the amount is disputed and no prejudgment interest is available. See *Midwest Asphalt Coating v. Chelsea Plaza Homes*, 45 Kan. App. 2d 119, 126-27, 243 P.3d 1106 (2010) (resolving a claim brought under Kansas Fairness in *Private* Construction Contract Act).

This boils down to whether Murray's counterclaims make Lindsey's claim for money owed under the contract "disputed" under the Act. Reasoning by analogy, we think not. Kansas law generally provides that prejudgment interest is allowable on liquidated claims. A claim is liquidated when both the amount due and the date due are fixed and certain or ascertainable by mathematical computation. *Miller v. Botwin*, 258 Kan. 108, 119, 899 P.2d 1004 (1995).

An examination of general legal principles makes our point. A question about the amount of a setoff or counterclaim does not change the liquidated nature of the damages for breach of contract. *Arrowhead Const. Co.*, 233 Kan. at 251; *Phelps Dodge Copper Products Corp. v. Alpha Construction Co.*, 203 Kan. 591, 594-97, 455 P.2d 555 (1969); *J. Walters Const. Co. v. Greystone South Partnership*, 15 Kan. App. 2d 689, 698-700, 817 P.2d 201 (1991).

Again, "'the debtor may not defeat the creditor's right to interest on such a claim by setting up an unliquidated claim as a setoff.'" *Phelps Dodge Copper Products Corp.*, 203 Kan. at 596. In *Phelps Dodge Copper Products Corp.*, there was no dispute as to the amount owed to Phelps Dodge for goods sold and delivered. Phelps Dodge's claim was

liquidated when payment became due. The fact that the extent of delay damages sought as a counterclaim had not been determined did not change the liquidated nature of Phelps Dodge's damages. 203 Kan. at 594-97. Raising counterclaims does not erase the fact that Lindsey did the work and was entitled to payment.

Murray cites *Arrowhead Const. Co.*, 233 Kan. 241, Syl. ¶ 7, where the court affirmed denial of prejudgment interest because the amount of damages was not liquidated until the trial court found that the price of the contract was for $1.35 per square foot. It offers little support. In that case, the price that one party was obligated to pay the other for services was contested. Here, the amount that Murray agreed to pay Lindsey for performance of the masonry work was not contested.

Lindsey was owed money for work that it had performed. Murray was paid by the owner for this work. Lindsey's claims were liquidated 7 days after Murray was paid for the work by the owner. See K.S.A. 16-1903(f). The district court was correct. A brief review is helpful here.

On the Blue Valley #22 project, the entire $15,916 could be viewed as undisputed. Lindsey completed its work on the project. The $5,511 in damages that Murray sought to repair the roof did not change the undisputed nature of the amount that Lindsey was due under the contract. There was no evidence that Lindsey damaged the roof. Murray's theory for relief was that Jon Lindsey had agreed to pay a 1/3 share of the cost to repair the roof.

On the New Highlands project, Lindsey completed its work. Lindsey submitted unpaid pay applications in the amount of $83,794. The district court held that Murray was entitled to recover $55,250 to remediate the rebar omission. The district court also held that Murray was entitled to recover $5,957 in damages to remediate damage to the water proofing and protection board. The district court set off Lindsey's damages accordingly,

24

resulting in a $22,587 judgment awarded to Lindsey. The court awarded interest, costs, and attorney fees on the net judgment only. Murray had claimed an additional $31,232 in damages, but it did not brief this claim. The net judgment of $22,587 could be viewed as undisputed.

With regard to the Sports Field Buildout, the entire $12,565 could be viewed as undisputed. Lindsey completed its work on the project. Murray claimed $4,166 in damages for weather-related delays. But delay damages do not change the liquidated nature of the claim. *Phelps Dodge Copper Products Corp.*, 203 Kan. at 594-97.

With regard to the Blue Valley #10 project, the entire judgment could be viewed as undisputed. Lindsey submitted pay applications for work done in August, September, and October 2010. Lindsey represented it had completed 65 percent of the work. Murray's damages it alleged in its counterclaim were incurred after Lindsey stopped work. That does not affect the certain sum owed to Lindsey.

In a separate attack, Murray argues that attorney fees and interest could not be awarded under the Act because the contract was unknowable until the district court defined its terms. Murray cites a quantum meruit case for support *Midwest Asphalt Coating*, 45 Kan. App. 2d 119. A panel of this court held that the Kansas Fairness in Private Construction Contract Act did not apply to a quantum meruit case because the damages were never determined until the award was made. 45 Kan. App. 2d at 126-27. While the two Acts—covering public contracts and private contracts—seek the prompt payment of agreed amounts, we are not persuaded by this quantum meruit argument.

When a court resolves a case based on quantum meruit, it finds that no contract existed. In such a case, the law creates a contract to prevent unjust enrichment. *Mai v. Youtsey*, 231 Kan. 419, 422, 646 P.2d 475 (1982). Thus, the *Midwest Asphalt Coating* court held that the damages were not liquidated until so created. 45 Kan. App. 2d at 127.

25

In contrast, an implied-in-fact contract has the same legal effect as an express contract. *In re Estate of Langdon*, 165 Kan. at 274. The difference lies in how mutual assent was given. See *Ellis v. Berry*, 19 Kan. App. 2d 105, 108, 867 P.2d 1063 (1993); 17 C.J.S., Contracts §§ 5, 6; 17A Am. Jur. 2d, Contracts §§ 12, 16. But importantly, the parties create an implied-in-fact contract, not the law.

Murray also cites the district court's statement that the implied-in-fact contract contained "no time frame for payment." However, the Act does provide a timeframe for payment. According to the terms of the Act, the parties cannot contract contrary to its terms. We find no error by the district court here.

*After finding that a contract existed, the district court did not need to explore equitable remedies.*

It is fundamental that equitable remedies are generally not available if there is an adequate remedy at law. *Nelson v. Nelson*, 288 Kan. 570, 597, 205 P.3d 715 (2009); *Midwest Asphalt Coating*, 45 Kan. App. 2d at 123; 42 C.J.S., Implied Contracts § 8. Damages for breach of contract is a legal remedy.

This case was tried upon the theory of breach of contract. Contracts can be express or implied in fact. Both express and implied-in-fact contracts require assent. The difference is how assent is manifested. Assent to an express contract is shown by written or spoken words; while assent to an implied-in-fact contract is inferred from conduct. See *Ellis*, 19 Kan. App. 2d at 108; 17 C.J.S., Contracts §§ 5, 6; 17A Am. Jur. 2d, Contracts §§ 12, 16.

Contrary to Murray's contentions, the trial court did find that a contract existed—an implied-in-fact contract. Thus, the court had no reason to resort to equitable remedies.

26

*Sufficient evidence supports the finding that Murray breached this implied-in-fact contract.*

Murray contends that there was not substantial competent evidence to support the trial court's finding that Murray breached the implied-in-fact contract.

We review the trial court's factual findings for substantial competent evidence. Substantial competent evidence is such legal and relevant evidence as a reasonable person might accept as being sufficient to support a conclusion. *Gannon v. State*, 298 Kan. 1107, 1175-76, 319 P.3d 1196 (2014). Appellate courts do not reweigh the evidence, pass on the credibility of witnesses, or redetermine questions of fact. *U.S.D. No. 233 v. Kansas Ass'n of American Educators*, 275 Kan. 313, 320, 64 P.3d 372 (2003).

This controversy centers on the end of the two companies' working relationship. Murray contends that no payment was due to Lindsey at the time Lindsey walked off the job. Murray also contends that substantial competent evidence does not support the district court's finding about why Lindsey walked off the job.

Indeed, the parties' payment history shows that no payment was due to Lindsey at the time Lindsey walked off the job. Lindsey's proposal provided payment terms. The proposal stated that payment was to be made 30 days after application and retainage was to be no greater than 5 percent. Murray never accepted those terms. On October 18, 2010, Lindsey's attorney wrote to Murray that payments were "seriously delinquent" and referred to section 4.7.1 of the AIA subcontract (remedies for nonpayment). At trial, Jon Lindsey acknowledged that no payments had been made within 30 days and that 10 percent retainage was withheld throughout, though his pay applications stated 5 percent should be withheld.

27

The district court found that section 4.7.1 of the AIA subcontract could not have served as a basis for Lindsey to stop work and, in fact, it was not the reason that Lindsey stopped work. Murray's words convinced Lindsey to leave.

> "The Court finds and concludes that it was not the payment schedule or delay the lawyer referenced that were the reason Lindsey stopped work but rather Murray's repeated statements to Lindsey that Murray was not going to pay combined with Murray's shutting off the masonry's necessary water and removing the meter that is the reason provided by the evidence and there was no evidence to the contrary or even disputing it."

The court later clarified this finding:

> "When the subject came up, the testimony was that Mr. Murray said he was not going to pay—Murray Construction was not going to pay Lindsey Masonry.
> Now when that testimony was offered, it was never said, and the testimony never was, that Murray is not going to pay Lindsey because they don't have the money. Or, Murray is not going to pay Lindsey because payments are not yet due.
> Now I understand that you would like to extract that, and an argument could be made, but that wasn't the way that testimony was offered, and was not contradicted.
> Mr. Lindsey said he was told, on more than one occasion, I'm not going to pay. Period.
> And so you—I didn't find any evidence to support a conclusion that the statement was: I'm not going to pay because a payment is not due. Or, I'm not going to pay because I haven't been paid by the owner. I didn't find any evidence of that."

Jon Lindsey testified that Gene Murray told him several times that he was not going to pay Lindsey. A fair reading of Jon's testimony is that Gene said he was not going to pay, period. Gene did not contradict or explain Jon's testimony. Lindsey testified that his company stopped working because of Murray's failure to pay, turning off the water, and forcing Lindsey off the job. The district court's finding was supported by substantial competent evidence.

28

Finally, Murray contends that the court's finding that Murray turned off the water and removed the meter is not supported by evidence. Jon Lindsey testified that Murray turned off Lindsey's supply of water to mix mortar and removed the water meter from the hydrant so Lindsey could not work. A Murray witness testified Lindsey had access to water. We will not reweigh the evidence. See *U.S.D. No. 233*, 275 Kan. at 320. That task is for the district court and its findings are supported by substantial competent evidence.

Affirmed.

* * *

ATCHESON, J., concurring: Although the majority reaches the correct result here, I fail to see this as a case dependent upon contracts implied in fact. The evidence actually shows that Defendant Murray & Sons Construction Co. accepted the terms of the written contracts Plaintiff Lindsey Masonry Co. offered in its proposals to work as a subcontractor on the school projects. Accordingly, Murray & Sons was bound to those contracts and the other terms of the proposals. Based on the trial record and the parties' representations on appeal, I do not understand the relief the Johnson County District Court granted under the implied contracts to be different from what Lindsey would have received under its proposed contracts that really governed. I, therefore, concur in affirming the district court judgment entered against Murray & Sons. But the district court and the majority misapply the doctrine of implied-in-fact contracts to these commercial transactions between sophisticated business entities.

Each of these major construction projects for the Blue Valley School District got off to a similar start for Lindsey and Murray & Sons. On each project, Murray & Sons intended to bid the job as the general contractor and invited a proposal from Lindsey to perform the masonry work. Lindsey submitted a written proposal to Murray & Sons for each job outlining the scope of the work it would do, a dollar amount it would be paid,

29

and other terms under which it would perform. The proposals stated that if they were accepted by Murray & Sons, "the parties will enter into an AIA Document A-401 Standard Form of Agreement," as modified in several specifically identified ways.

As is common with government projects, the bids were opened and reviewed at a public meeting. In each instance, Murray & Sons submitted the lowest acceptable bid to act as general contractor. The school district then awarded the construction contract to Murray & Sons. Gene Murray, the principal of the company, called Jon R. Lindsey, his counterpart at Lindsey, the same day to say Murray & Sons had been given the contract. The trial evidence shows that for each job Gene Murray told Jon Lindsey that Murray & Sons would subcontract the masonry work to Lindsey as outlined in Lindsey's proposal. Gene Murray neither indicated the proposal to be unacceptable in any of its particulars nor suggested some negotiation of the proposed terms would be necessary. The district court made factual findings that during every one of those calls, Gene Murray informed Lindsey the masonry proposal for the particular project "had been accepted." Typically within a day or so, Jon Lindsey faxed a brief letter to Gene Murray acknowledging the acceptance of Lindsey's proposal and expressing his expectation for a mutually rewarding business relationship. Gene Murray never responded to those letters in a way suggesting material terms of that business relationship had yet to be resolved.

Later, Lindsey sent Murray & Sons a signed written contract conforming to the modified version of AIA Document A-401 described in the proposal. Murray & Sons responded by sending Lindsey a different form contract drafted by the Associated General Contractors of Kansas. Neither party signed the other's contract. Lindsey began work on the respective projects, and Murray & Sons started making periodic payments to Lindsey for its work.

As recounted in the majority opinion, the work relationship between the two companies deteriorated and eventually broke out in full-scale litigation. The district court

30

had to sort out the legal relationship between the companies with respect to the four projects. Although neither Lindsey nor Murray & Sons argued they had implied-in-fact contracts on any of the jobs, the district court latched on to that theory to establish limited terms and conditions governing their business dealings. The majority goes along. That exercise seems unnecessary and inappropriate. Implied-in-fact contracts entail a somewhat exotic variation on the usual pattern of contract formation. The trial evidence, however, comfortably fits the usual pattern, so there is no need to resort to legal exotica.

In the common scheme, a contract consists of an offer by one party to perform a service or to supply an object in exchange for something of value, typically money, followed by an acceptance of that offer from another party. *M West, Inc. v. Oak Park Mall,* 44 Kan. App. 2d 35, 49, 234 P.3d 833 (2010) (noting that offer, acceptance, and consideration constitute "all the components of a valid contract"). Thus, for example, a high schooler may ask to mow a homeowner's lawn for $30. That's an offer. The homeowner may reply, "Okay, be here next Tuesday." That's an acceptance. The two now have a contract. The mutual promises—to mow on Tuesday and to pay $30— provide the consideration necessary to support the contract. *Peoples Exchange Bank v. Miller*, 139 Kan. 3, 7, 29 P.2d 1079 (1934) (exchange of promises of future performances provide consideration for bilateral contract); *Barker v. Kansas Dept. of Labor*, No. 114,199, 2016 WL 3202698, at *3 (Kan. App. 2016) (unpublished opinion) (each mutually agreed-upon promise of performance provides consideration for the other resulting in a bilateral contract). The parties, of course, may bargain before agreeing on an exchange of promises. They may dicker over price or the manner of performance. The homeowner might offer to pay $25 for the lawn mowing. The high schooler could counteroffer to mow the lawn and trim the hedges for $35, and if the homeowner agrees, those are the mutual promises forming the contract.

Here, Lindsey offered to perform masonry work for Murray & Sons on each of the construction projects in exchange for Murray & Sons' promise to pay a specified amount

31

and otherwise abide by the terms and conditions in the proposal. So if Murray & Sons accepted a proposal, the company thereby entered into a bilateral contract with Lindsey the provisions of which conformed to that proposal.

A party accepts an offer through an objective manifestation of assent or agreement to the offer. *Southwest & Assocs., Inc. v. Steven Enterprises*, 32 Kan. App. 2d 778, Syl. ¶ 2, 88 P.3d 1246 (2004). Unless an offer requires acceptance be given in a certain way, no particular words or acts are necessary as long as the offeree's overt agreement is apparent. An oral acceptance of a written offer, therefore, is sufficient. *Fey v. Loose-Wiles Biscuit Co.*, 147 Kan. 31, 35, 75 P.2d 810 (1938); see *Hartford Fire Ins. Co. v. P & H Cattle Co., Inc.*, 451 F. Supp. 2d 1262, 1273 (D. Kan. 2006). Likewise, an offeree's subjective, uncommunicated intent makes no difference—all that is required and all that counts is outward assent. *Andra v. Peebler Rev. Trust*, No. 106,432, 2012 WL 4937465, at *7 (Kan. App. 2012), *rev. denied* 298 Kan. 1201 (2013) (A party manifesting assent to an offer creates a contract "even if that party believes he or she may later renounce the agreement with impunity or harbors an unstated intent not to be bound."); 1 Corbin on Contracts § 4.10, p. 619 (rev. ed. 1993).

Although an oral acceptance may be legally sufficient, it is evanescent and, thus, open to being disputed in ways an offeree's signature on a written contract cannot. But those disputes bear on proof of the acceptance, not its legal import once proved. Here, as I have said, the district court sitting as the finder of fact expressly determined that Gene Murray orally accepted without qualification or reservation Lindsey's proposals for the masonry work on each of the four projects. And those findings are supported by substantial competent evidence. See K.S.A. 2015 Supp. 60-252(a)(1) and (5) (In an action tried to the district court, its factual findings "must not be set aside unless clearly erroneous[.]"). The upshot is that Lindsey and Murray & Sons entered into contracts for the masonry work on those projects that conformed to the terms set out in Lindsey's proposals, including the modified AIA Document A-401 Standard Form of Agreement.

32

Those contracts controlled the companies' legal relationship and the dispute we have before us.

Gene Murray's refusal to sign the AIA documents Lindsey later forwarded amounts to a legal irrelevancy, since the companies had already offered and accepted those terms to form binding contracts. Notwithstanding its own factual findings, the district court mistakenly concluded there had been no formal acceptance of an offer because neither side could produce a written contract signed by the other. The conclusion, however, misperceives what is required for a valid acceptance. The district court had no need to go in search of some implied-in-fact contracts to establish the terms of the legal relationships between Murray & Sons and Lindsey on the projects or to resolve their legal dispute over those projects.

But so far as I can tell from the record, the district court's error makes no practical difference in this case, since Lindsey would receive essentially the same relief under the actual contracts the parties entered into for the projects. During oral argument, the lawyers did not identify any way Lindsey would have gotten more (or less) in a judgment based on the terms of the modified AIA agreement.

The real problem here lies in the idea that the doctrine of implied-in-fact contracts ought to be deployed when the parties actually have engaged in the readily identifiable steps necessary to form a traditional contract or when the parties are presumptively sophisticated business entities undertaking a multifaceted commercial deal. Courts may find implied-in-fact contracts when the overall circumstances indicate the parties intended to be bound to certain mutual obligations but have not formally exchanged discrete offers or acceptances. The terms of their contractual relationship must be discerned from their general communications and the pattern of their interactions. See *Atchison County Farmers Union Co-op Ass'n v. Turnbull*, 241 Kan. 357, 363, 736 P.2d

33

917 (1987) ("Contracts implied in fact are inferred from the facts and circumstances of the case and are not formally and explicitly stated in words."); *Degnan v. Young Bros. Cattle Co.*, 152 Kan. 250, 255, 103 P.2d 918 (1940) (Parties "'may arrive at agreements, by acts and conduct which evince a mutual intention to contract and from which the law implies a contract.'") (quoting *Rains v. Weiler*, 101 Kan. 294, Syl. ¶ 1, 166 P. 235 [1917]); 17 C.J.S., Contracts § 6, p. 391 ("[A]n implied-in-fact contract is founded upon a meeting of the minds, which, although not embodied in an express contract, is inferred, as a fact, from the conduct of the parties showing, in light of the surrounding circumstances, their tacit understanding."). Judicial recognition of implied-in-fact contracts necessarily entails an amorphous exercise requiring interpretation of parties' inexact signals to arrive at sufficiently definite rights and duties to bind those parties to a legally enforceable agreement. In its written decision, the district court alluded to precisely that difficulty in trying to piece together the specific terms of the contracts it sought to imply in fact.

Implied-in-fact contracts, then, function as a convention to impose some legal structure upon arrangements parties have left unstructured either because they have failed to appreciate the utility that structure might provide if their relationship does not go as planned or because they consider their arrangements so straightforward they have no need to fully articulate the terms. To be sure, implied contracts serve an entirely beneficial purpose in sorting out legal relationships between parties taking a casual or unsophisticated approach to their mutual transactions and in resolving their disputes about rights and duties arising from comparatively simple transactions.

But the convention ought to be cautiously invoked to find enforceable agreements governing complex transactions when the parties have engaged in recognizable steps toward making a formal contract. If those steps have not yielded an identifiable contract, then the parties likely have not entered into an enforceable agreement. (Here, of course, they did, as I have outlined.) To be binding, a contract typically must address all material

34

terms and conditions related to the transaction. *Dougan v. Rossville Drainage Dist.*, 270 Kan. 468, 488, 15 P.3d 338 (2000) ("to form a binding contract, there must be a meeting of the minds as to all essential terms"); see *Ekedahl v. COREStaff, Inc.*, 183 F.3d 855, 858 (D.C. Cir. 1999); 17 C.J.S., Contracts § 78, p. 485 ("[W]here the parties fail to agree to all the material terms, no contract is formed even if the parties intended to be bound . . . ."). And courts typically cannot make contracts for the parties by imposing essential terms that the parties themselves have failed to agree upon. See *Fourth Nat'l Bank & Trust Co. v. Mobil Oil Corp.*, 224 Kan. 347, 353, 582 P.2d 236 (1978) ("It is not the function of the courts to make contracts but to enforce them."); *Bank of the Ozarks, Inc. v. Walker*, 2014 Ark. 223, at *5, 434 S.W.3d 357 (2014). With intricate commercial transactions, a court attempting to imply in fact a contract from the parties' conduct will, more likely than not, wind up either creating at least some material terms that the parties never mutually accepted or omitting entirely what reasonably would be considered essential terms for a formal contract. Either way, the court would flout accepted legal principles in the guise of "implying" a contract.

This case appears to be an example of the latter failing. Lindsey quoted a price of more than $1,000,000 for the masonry work on three of the four projects. The district court concluded the implied-in-fact contract for each consisted simply of the description of work outlined in Lindsey's proposal and the quoted price. It seems improbable that experienced contractors would find those provisions alone to be the only terms and conditions essential for a contract covering work of that scope and value. Indeed, the detailed written contracts Lindsey and Murray & Sons exchanged belie that premise. In turn, the notion they actually agreed to such a spare arrangement through their actions similarly seems more the product of a legal fiction than a genuine implied-in-fact contract.[*]

[*]Even absent a formal contract or one implied in fact, a party conferring a benefit on another party may be equitably entitled to compensation for the fair value of the benefit. See *Haz-Mat Response, Inc. v. Certified Waste Services Ltd.*, 259 Kan. 166,

35

Syl. ¶ 6, 910 P.2d 839 (1996) (quantum meruit or unjust enrichment); *Bouton v. Byers*, 50 Kan. App. 2d 34, 41, 321 P.3d 780 (2014) (promissory estoppel), *rev. denied* 301 Kan. 1045 (2015). If the parties had failed to enter into a contract for any of the projects, Lindsey would have had an equitable claim for some compensation. In this action, Lindsey asserted alternative claims based on promissory estoppel and quantum meruit.

In short, Murray & Sons accepted the offers made by Lindsey in the proposals it submitted for the masonry work on the four projects. Those proposals included the AIA contract, as modified, so those terms and conditions became part of the bargain to which Murray & Sons agreed. The parties, therefore, had formal contracts that governed each of the projects disputed in this case. The doctrine of implied-in-fact contracts had no place here. I, nonetheless, concur in affirming the judgment for Lindsey because substituting doubtful implied-in-fact contracts for the formal contracts the parties actually entered into did not alter the appropriate relief—a wholly fortuitous turn that should not detract from that misapplication of contract law.