NOT DESIGNATED FOR PUBLICATION

No. 117,301

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Matter of the Parentage of
M. F., A Minor Child;
Brought by K.L.,
*Appellant*,

v.

T. F.,
*Appellee*.

MEMORANDUM OPINION

Appeal from Butler District Court; DAVID A. RICKE, judge. Opinion filed June 7, 2019. Affirmed.

*Carolyn Sue Edwards*, of Law Offices of Carolyn Sue Edwards, P.A., of Wichita, for appellant.

*Christopher J. Vinduska* and *Alex P. Flores*, of Klenda Austerman LLC, of Wichita, for appellee.

Before MALONE, P.J., SCHROEDER, J., and MCANANY, S.J.

PER CURIAM: K.L. and T.F. were in a long-term, same-sex relationship during which T.F. gave birth to a child, M.F., through artificial insemination. K.L. and T.F. never executed a written coparenting agreement concerning M.F. About one year after K.L. and T.F. ended their relationship, K.L. filed an action in district court to establish her parentage of M.F. and to receive custody, visitation, and child support orders. After a three-day trial, the district court denied K.L.'s petition, finding that T.F. was M.F.'s sole legal parent.

1

On appeal, K.L. argues that (1) the district court erred in failing to find there was a "meeting of the minds" between the parties about whether they were going to coparent, (2) the district court erred in failing to find that K.L. had notoriously represented herself to others as M.F.'s parent, and (3) the district court erred in applying the parental preference doctrine in denying K.L.'s petition. For the reasons stated in this opinion, we affirm the district court's judgment.

FACTUAL AND PROCEDURAL BACKGROUND

The parties are familiar with the facts and the procedural history of the case. We will only summarize the facts in enough detail to address the issues in this appeal. K.L. and T.F. met in 2007, and began a long-term, committed, same-sex relationship. Although the nature of their relationship was disputed at trial, neither party is challenging the district court's factual finding that K.L. and T.F. had a "committed, same[-]sex relationship."

T.F. had always wanted more than one child, while K.L. was unsure about having any children. In 2011, K.L. underwent a hysterectomy, which left her unable to carry a pregnancy. In 2012, T.F. began pursuing artificial insemination.

T.F.'s fertility doctor required her and K.L.—as domestic partners—to see a licensed specialist clinical social worker before any insemination attempt. T.F. and K.L. met with Renee Cristiano who ultimately provided a letter stating that the couple "plan to be co-parents." T.F. later testified that she and K.L. lied to Cristiano about planning to be coparents because T.F. knew she needed Cristiano's recommendation to proceed with insemination. Cristiano recommended to T.F. and K.L. that they consult with an attorney about the situation. Despite Cristiano's recommendation, the couple did not consult with an attorney.

2

T.F.'s first insemination attempt did not succeed, but the second led to a pregnancy. While pregnant, T.F. gave K.L. a Mother's Day card with a message conveying that T.F. believed that K.L. "will be a great mother."

K.L., her mother, and several members of T.F.'s family were present at the birthing center when T.F. gave birth to M.F. on October 19, 2013. When T.F. completed the form from which the birth certificate would be generated, she gave M.F. the same last name as T.F. but she also included K.L.'s last name as M.F.'s "second middle name." A few months later, T.F. amended M.F.'s birth certificate to remove K.L.'s last name.

When T.F. returned to work in January 2014, she paid K.L.'s mother, a retired daycare provider, to care for M.F. while T.F. was at work. T.F. later testified that it was solely her responsibility to provide food for M.F. and to meet M.F.'s financial needs. She introduced into evidence copies of credit card statements that she asserted "show[ed] that [she] paid for everything in regards to" M.F., including Cristiano's bill, payments for artificial insemination services, and payment for a sonogram. T.F. also submitted bills she claimed she alone paid for obstetric and gynecological services, as well as invoices for natural medicines and supplements she bought for M.F.

In late November or early December 2014, the couple ended their relationship. T.F. and M.F. moved out of the home they shared with K.L. in Andover, Kansas, to a house in Inman, Kansas. After T.F. and M.F. moved to Inman, K.L. continued to spend some time with M.F., although the frequency, consistency, and nature of that contact was disputed. K.L. provided no financial support for M.F. after T.F. moved out. T.F.'s father testified that he gave T.F. money "several times" to help her, in part because K.L. never contributed to meeting M.F.'s financial needs.

3

In January 2015, T.F. met R.M., and the couple became engaged in May 2015. In October 2015, T.F. and M.F. moved to Nebraska, and T.F. married R.M. on November 7, 2015.

On November 12, 2015, K.L. filed a verified petition in the district court, seeking to establish parentage, custody, visitation, and child support. K.L. asserted in the petition that she and T.F. had agreed to coparent M.F. and that she is M.F.'s lawful mother under the Kansas Parentage Act (KPA), K.S.A. 2018 Supp. 23-2201 et seq. T.F. filed an answer disputing K.L.'s claims and the parties conducted some written discovery.

*Trial proceedings*

The district court held a bench trial on February 2, 5, and 17, 2016. Both parties called many witnesses and introduced written exhibits. We will not summarize in detail all the evidence presented at the trial. Suffice it to say that K.L. and some members of her family supported her claims and confirmed that she consistently held herself out as M.F.'s parent. In contrast, T.F. and some members of her family disputed K.L.'s claims and testified that she never assumed the role of being M.F.'s parent.

K.L. also called nonfamily members as witnesses who supported her claim that she held herself out as M.F.'s mother. These witnesses included T.F.'s obstetrician, two nurses, a coworker, and a neighbor. K.L. also introduced several written exhibits, including Cristiano's letter, a birth plan for the birthing center, the Mother's Day card, a birthday card, and a baby shower invitation, all supporting her claim of a mother/child relationship with M.F. In contrast, T.F. offered the testimony of a swim instructor and a daycare provider who testified that they considered T.F. to be M.F.'s only parent.

After hearing closing arguments, the district court ruled from the bench, denying K.L.'s petition. The district court made several findings in its oral ruling and ordered T.F. to prepare a journal entry. The district court did not sign and file a written journal entry of

judgment until nearly 10 months later on December 14, 2016. The written journal entry of judgment included these findings:

> "1. That Petitioner and Respondent had a committed, same sex relationship. While they remained in a relationship, the parties jointly purchased a home and had a joint bank account.
>
> "2. That it was the Respondent's decision to have a child, and not a joint decision of the parties.
>
> "3. That there was no agreement between the parties, written or oral, regarding sharing of parenting and financial responsibilities for the child, nor did such sharing of these responsibilities occur in actual practice. Respondent was responsible for the day-to-day parenting of the child and had financial responsibility for the child.
>
> "4. That the child's last name on her birth certificate is that of Respondent. The child does not have, and never had, a hyphenated surname including the last names of both parties.
>
> "5. That the child was too young and her speech not well enough developed when the parties separated for the Court to determine how she referred to Petitioner.
>
> "6. That the swim instructor and daycare provider testified they dealt exclusively with one parent and considered only Respondent to be the parent of the child, not Petitioner.
>
> "7. That the Court finds that there was not an open and notorious assumption of parenting responsibilities for the child by Petitioner.
>
> "8. That the evidence does not establish that a mother/child relationship exists between Petitioner and the child, pursuant to the Kansas Parentage Act and *Frazier v. Goudschaal*. Accordingly, the Court grants no relief upon Petitioner's Verified Petition to Establish Parentage, Custody, Visitation and Child Support. The Court need not appoint a guardian ad litem to determine the best interest of the child or make other orders."

*Proceedings after the district court's ruling*

K.L. filed a notice of appeal on February 24, 2016, before the district court had filed its journal entry of judgment. On January 12, 2017, K.L. filed a second notice of appeal. One week later, T.F. moved to dismiss K.L.'s appeal for failure to timely docket

5

the appeal after the journal entry of judgment was filed. The district court held a hearing and granted the motion, dismissing K.L.'s appeal in a written order filed on February 7, 2017. K.L. filed a motion with this court for reinstatement of her appeal and to docket her appeal out of time, which our court granted, and K.L.'s appeal was docketed on March 16, 2017.

On May 26, 2017, the parties jointly informed this court that a district court recording device malfunction caused the loss of some of the trial testimony. Thus, on May 30, 2017, this court stayed the appeal and remanded to the district court for recreation of the missing testimony, ordering K.L. to file periodic status reports. K.L. consistently failed to timely file those status reports.

On November 29, 2017, the district court issued an order resolving the parties' disagreements over the recreated testimony and directing the parties to prepare and submit for approval exhibits reflecting those resolutions, after which the recreations would be added to the record on appeal. The status reports filed with this court from December 2017 to July 2018 all represented that the district court had ruled on the parties' disagreements over the recreated testimony, and that the parties would soon file journal entries memorializing those rulings. When K.L. failed to file a status report as ordered in August 2018, this court lifted the stay and set a due date for K.L.'s brief.

The day K.L.'s brief was due, she filed a motion for extension of time because of "[t]he press of other business, and of pressing private family matters." This court granted the extension and cautioned that no further extensions would be granted. K.L. filed her brief on October 19, 2018. After receiving extensions of time, T.F. filed her brief on February 21, 2019. K.L. sought three extensions of time to file a reply brief, but she ultimately did not file a reply brief that complied with Kansas Supreme Court Rule 6.05 (2019 Kan. S. Ct. R. 36). This court heard oral argument on May 14, 2019. At oral

6

argument, K.L.'s counsel confirmed that K.L. has been denied any visitation or contact with M.F. since the district court's ruling in February 2016.

On appeal, K.L. argues that (1) the district court erred in failing to find there was a "meeting of the minds" between the parties about whether they were going to coparent, (2) the district court erred in failing to find that K.L. had notoriously represented herself to others as M.F.'s parent, and (3) the district court erred in applying the parental preference doctrine in denying K.L.'s petition. We will address each claim in turn.

DID THE DISTRICT COURT ERR IN FAILING TO FIND A COPARENTING AGREEMENT?

K.L. first argues that the district court erred in failing to find there was a "meeting of the minds" between the parties about whether they were going to coparent. K.L. frames this as an evidentiary issue and asserts that we are to review whether the district court's factual findings are supported by substantial competent evidence and whether the findings are sufficient to support the district court's conclusions of law. Substantial evidence is such legal and relevant evidence as a reasonable person might accept as sufficient to support a conclusion. See *Owen Lumber Co. v. Chartrand*, 283 Kan. 911, 915-16, 157 P.3d 1109 (2007).

When a trial court decision is challenged for sufficiency of evidence or as being contrary to the evidence, an appellate court does not reweigh the evidence or pass on the credibility of the witnesses. If the evidence, when considered in the light most favorable to the prevailing party, supports the district court's decision, it will not be disturbed on appeal. See *Gannon v. State*, 298 Kan. 1107, 1175-76, 319 P.3d 1196 (2014).

In ruling from the bench, the district court found that there was no signed parenting agreement and that there had never been "a true meeting of the minds as to a parenting agreement." In its journal entry, the district court found that "there was no

7

agreement between the parties, written or oral, regarding sharing of parenting and financial responsibilities for the child, nor did such sharing of these responsibilities occur in actual practice." The district court concluded that "the evidence does not establish that a mother/child relationship exists between [K.L.] and [M.F.], pursuant to the Kansas Parentage Act and *Frazier v. Goudschaal*." Both parties rely on factual similarities between this case and our Supreme Court's decision in *Frazier v. Goudschaal*, 296 Kan. 730, 295 P.3d 542 (2013), so we will begin our analysis by reviewing that case.

*Frazier v. Goudschaal*

Kelly Goudschaal and Marci Frazier were committed to a long-time, same-sex relationship, during which they jointly decided to have two children through artificial insemination. With the birth of each child, the couple executed a coparenting agreement that, among other provisions, addressed the contingency of a separation. The coparenting agreement "identified Frazier as a de facto parent," "specified that her 'relationship with the children should be protected and promoted,'" and stated that Goudschaal and Frazier "intended 'to jointly and equally share parental responsibility.'" 296 Kan. at 733.

After the couple separated, Frazier sued to enforce the coparenting agreement. Goudschaal moved to dismiss, arguing "that the district court lacked subject matter jurisdiction to address Frazier's requests for child custody or parenting time." 296 Kan. at 734. The district court denied the motion, finding that it had jurisdiction under the KPA because Frazier had "interested party status by virtue of her claim that she has notoriously and in writing acknowledged the mother and child relationship with these children." 296 Kan. at 735. After an evidentiary hearing, the district court awarded joint custody.

On appeal, Goudschaal argued that "'an action to enforce a co-parenting [*sic*] agreement . . . is not a cause of action recognized by Kansas courts.'" 296 Kan. at 736. She also argued that the KPA does not afford "mother" status to anyone other than a biological mother or a woman who has legally adopted a child. 296 Kan. at 736-37.

Goudschaal contended that because she had not been found unfit as a mother, the district court violated her constitutional and due process rights to direct her children's upbringing when it awarded partial custody to Frazier, a third party. 296 Kan. at 737-38.

Our Supreme Court noted that the district court had jurisdiction to order specific performance of the coparenting agreement because "'"[t]he jurisdiction of equity to grant specific performance of contracts . . . is well settled."' [Citation omitted.]" 296 Kan. at 745. The court rejected Goudschaal's "blanket condemnation" that "such an agreement is always contrary to public policy." 296 Kan. at 747. The court then addressed the coparenting agreement under the tenets of contract law, ultimately holding that the coparenting agreement between Frazier and Goudschaal did not violate public policy and was enforceable. 296 Kan. at 748-55. The court found that the coparenting contract undermined Goudschaal's parental preference and due process arguments because

> "she exercised her due process right to decide upon the care, custody, and control of her children and asserted her preference as a parent when she entered into the coparenting agreement with Frazier. If a parent has a constitutional right to make the decisions regarding the care, custody, and control of his or her children, free of government interference, then that parent should have the right to enter into a coparenting agreement to share custody with another without having the government interfere by nullifying that agreement, so long as it is in the best interests of the children. Further, . . . parental preference can be waived and . . . the courts should not be required to assign to a mother any more rights than that mother has claimed for herself." 296 Kan. at 753.

The court also addressed Goudschaal's argument that the KPA does not afford "mother" status to anyone other than a biological or adoptive mother and held:

> "[A] female can make a colorable claim to being a presumptive mother of a child without claiming to be the biological or adoptive mother, and, therefore, can be an 'interested party' who is authorized to bring an action [under the KPA] to establish the existence of a mother and child relationship." 296 Kan. at 747.

9

Returning to our case, K.L.'s brief summarizes the trial evidence—in a light most favorable to her—supporting her claim that she and T.F. had agreed to coparent M.F. and argues that "[i]t is hard to fathom how a court could review this evidence and not find an agreement to coparent, and that coparenting occurred just as anticipated by both the women with this child." K.L. develops no other argument to support her claim on appeal that the district court erred in failing to find there was a "meeting of the minds" between the parties about whether they were going to coparent.

The evidence is undisputed that K.L. and T.F. never executed a written coparenting agreement concerning M.F. as the parties had executed in *Frazier*. We take K.L.'s argument to mean that her evidence established an *oral* coparenting agreement between the parties. But K.L.'s brief does not explain how an oral coparenting agreement would give her any enforceable rights under the KPA. As seen in *Frazier*, the importance of a written coparenting agreement under the KPA stems from the statutory provision that parenthood may be presumed if an individual "*in writing* recognizes [parenthood] of the child." (Emphasis added.) See K.S.A. 2018 Supp. 23-2208(a)(4). Under the plain language of the statute, an *oral* coparenting agreement does not create the same presumption under the KPA as a written coparenting agreement.

In any event, we will try to address the merits of K.L.'s claim that the evidence showed a "meeting of the minds" between the parties about coparenting. "Whether a contract exists depends on the intentions of the parties and is a question of fact." *U.S.D. No. 446 v. Sandoval*, 295 Kan. 278, 282, 286 P.3d 542 (2012). "The standard of proof for demonstrating the existence of an oral contract is the preponderance of the evidence," and the person asserting the contract bears the burden to prove its existence. 295 Kan. at 282.

In ruling from the bench, the district court found that there had never been "a true meeting of the minds as to a parenting agreement." In its journal entry, the district court found that "there was no agreement between the parties, written or oral, regarding sharing

10

of parenting and financial responsibilities for the child." The district court's finding that there had never been a coparenting agreement between the parties was a finding that K.L. failed to meet her burden to show by a preponderance of the evidence the existence of such an agreement. A finding that a party did not meet its burden of proof is a negative factual finding. In reviewing a negative factual finding, the appellate court must consider whether the district court arbitrarily disregarded undisputed evidence or relied on some extrinsic consideration such as bias, passion, or prejudice to reach its decision. *Cresto v. Cresto*, 302 Kan. 820, 847-48, 358 P.3d 831 (2015).

"In order to form a binding contract, there must be a meeting of the minds on all the essential elements." *U.S.D. No. 446*, 295 Kan. at 282. At trial, K.L. did not identify any "essential elements" of the alleged oral coparenting agreement. Instead, she argued generally that she and T.F. had been "on the same page" about coparenting and that "[f]or the most part," they shared M.F.'s expenses before their breakup. T.F. denied K.L.'s allegations that they had agreed to share parenting and caregiving responsibilities, testifying that K.L. "didn't have any responsibilities with [M.F.]" At another point, when asked if she and K.L. had an "agreement or arrangement regarding sharing of parental responsibilities for [M.F.]," T.F. replied, "No."

K.L. does not argue that any of the justifications for reversal of a district court's negative finding apply here. The trial evidence was hotly disputed and K.L. makes no claim that the district court disregarded undisputed evidence or relied on some extrinsic consideration such as bias, passion, or prejudice to reach its decision. Even if we apply a substantial evidence standard of review, as opposed to a negative finding standard of review, the evidence presented at trial, viewed in the light most favorable to T.F., supports the district court's finding that the parties had never reached a true meeting of the minds as to a coparenting agreement. As a result, we conclude that K.L. has failed to show any error by the district court in her first issue on appeal.

11

## DID THE DISTRICT COURT ERR IN FAILING TO FIND THAT K.L. HAD NOTORIOUSLY REPRESENTED HERSELF TO OTHERS AS M.F.'S PARENT?

K.L. next argues that the district court erred in failing to find that she had notoriously represented herself to others as M.F.'s parent. The KPA establishes procedures by which an unmarried person may establish a parent/child relationship with a child, even "without claiming to be the biological or adoptive mother." *Frazier*, 296 Kan. at 747. Practically speaking, this means that an individual who is not the biological or adoptive parent of a child may seek to legally validate a parent/child relationship under the KPA despite the KPA's use of the gendered pronouns. See 296 Kan. at 746-47; see also K.S.A. 2018 Supp. 23-2207 ("The parent and child relationship between a child and . . . [t]he mother may be established . . . under this act.").

Under the KPA, if a petitioner establishes that he or she "notoriously or in writing recognizes [parentage] of the child," a presumption of parentage exists that "may be rebutted only by clear and convincing evidence." K.S.A. 2018 Supp. 23-2208(a)(4) and (b). Based on this statute, the lack of a written coparenting agreement is not fatal to a parent's claim under the KPA. The "presumption [of parenthood] has two paths—one in which the parent 'notoriously' recognizes parentage, meaning the parent has openly recognized the child, and another in which the parent does so 'in writing.'" *Downs v. Gilmore*, No. 108,176, 2013 WL 1010667, at *4 (Kan. App. 2013) (unpublished opinion).

Under K.S.A. 2018 Supp. 23-2208, the initial burden of proof is on the petitioner to establish by a preponderance of the evidence a presumption of parentage. If the petitioner meets this initial burden, the burden of proof shifts to the respondent to rebut the presumption by clear and convincing evidence. If the presumption is rebutted, the burden of proof shifts back to the petitioner to go forward with the evidence. *In re W.L.*, 56 Kan. App. 2d 958, Syl. ¶ 6, ___ P.3d ___ (No. 119,536, filed April 19, 2019).

The district court's findings denying K.L.'s petition did not track the shifting burdens under K.S.A. 2018 Supp. 23-2208(a) and (b). Instead, the district court found only that "there was not an open and notorious assumption of parenting responsibilities for the child by [K.L.]." We interpret the district court's ruling as a finding that K.L. failed to meet her initial burden of proof to establish by a preponderance of the evidence a presumption of parentage. A district court's finding on whether an individual is a presumed parent under the KPA is a finding of fact. See *In re Paternity of E.G.S.*, No. 108,778, 2013 WL 2972697, at *3 (Kan. App. 2013) (unpublished opinion).

As with the last issue, K.L. asserts that we review the district court's factual findings to determine whether they are supported by substantial competent evidence. See *Owen Lumber Co.*, 283 Kan. at 915-16. But because the initial burden of proof was on K.L. to establish by a preponderance of the evidence a presumption of parentage, the district court's finding that she did not openly and notoriously assume her parenting responsibilities was a negative factual finding. In reviewing a negative factual finding, the appellate court must consider whether the district court arbitrarily disregarded undisputed evidence or relied on some extrinsic consideration such as bias, passion, or prejudice to reach its decision. *Cresto*, 302 Kan. at 847-48.

K.L. does not contend that the district court arbitrarily disregarded undisputed evidence, nor does she argue that the district court was motivated by any extrinsic consideration. Rather, she argues that there was more than sufficient evidence to support her claim that she notoriously asserted her parenthood of M.F. But all of the evidence cited by K.L. was disputed at trial. Essentially, K.L. asks this court to reweigh the evidence and find that the district court made the wrong decision when it found that she had not notoriously asserted her parenthood. But when reviewing a negative finding, "[a]n appellate court may not nullify a district court's disbelief of evidence, nor may it determine the persuasiveness of evidence that the district court may have believed." *In re Estate of Rickabaugh*, 305 Kan. 921, 935, 390 P.3d 19 (2017).

13

Even using K.L.'s proffered standard of review, there was sufficient evidence—viewed in the light most favorable to T.F.—to support the district court's finding that K.L. did not notoriously recognize her status as M.F.'s parent. T.F. testified that K.L. seldom went to M.F.'s pediatric appointments or help pay for them, nor did K.L. help pay for obstetric or gynecological services. T.F. testified that she and K.L. did not represent K.L. to others as M.F.'s parent. This testimony was corroborated by T.F.'s parents and there was evidence that M.F.'s swimming instructor, despite having met K.L., did not understand K.L. to be M.F.'s parent. T.F.'s father testified that he gave money to his daughter several times because K.L. never helped with M.F.'s financial needs. Also, K.L. did not take legal action to assert her parentage until a year after her relationship with T.F. ended, and she filed her case five days after T.F. and R.M. were married.

To be clear, K.L. presented substantial evidence that if found to be credible by the fact-finder would support her claim that she notoriously represented herself to others as M.F.'s parent. But the district court's decision denying K.L.'s petition reflects that the district court implicitly found T.F.'s testimony more credible than K.L.'s. The trial judge could observe the demeanor of the witnesses and was in the best position to assess their credibility. As we have already stated, an appellate court does not reweigh the evidence or pass on the credibility of the witnesses. *Gannon*, 298 Kan. at 1175-76. Based on our standard of review, K.L. has failed to show that the district court erred in finding that she did not notoriously represent herself to others as M.F.'s parent.

### DID THE DISTRICT COURT ERR IN APPLYING THE PARENTAL PREFERENCE DOCTRINE?

Finally, K.L. argues that the district court erred in applying the parental preference doctrine in denying her petition. K.L.'s brief frames the issue by asking: "Did [T.F.] exercise the parental preference doctrine in naming [K.L. as the] mother to this child and if so, can she change her mind?" But as T.F. points out, K.L.'s parental preference argument is not properly before this court for consideration.

14

Kansas Supreme Court Rule 6.02(a)(5) requires:

"Each issue [in an appellant's brief] must begin with citation to the appropriate standard of appellate review and a pinpoint reference to the location in the record on appeal where the issue was raised and ruled on. If the issue was not raised below, there must be an explanation why the issue is properly before the court." (2019 Kan. S. Ct. R. 35.)

K.L.'s brief under this section fails to set forth the standard of review and does not provide a pinpoint citation to the location in the record on appeal where the district court ruled on this issue. In fact, K.L.'s brief concedes that "[t]he court made no ruling on the parental preference doctrine question." K.L. has provided no explanation or reason why this court should address this issue for the first time on appeal. Rule 6.02(a)(5) is strictly enforced, even in cases involving parenting rights. See *In re Adoption of Baby Boy W.*, No. 116,582, 2017 WL 2001668, at *10 (Kan. App. 2017) (unpublished opinion) (finding that noncompliance with Rule 6.02[a][5] rendered a claim waived and abandoned). Thus, we find that K.L.'s parental preference argument is not preserved for appeal.

Affirmed.